UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LUCAS EWALD AHRENDT,<br><br>Defendant. | 4:23-CR-40092-KES<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Lucas Ewald Ahrendt is before the court on an indictment charging him with being an unlawful user of a controlled substance in possession of a firearm and possessing a firearm while being under indictment for a felony. See Docket No. 1. Mr. Ahrendt has filed a motion to suppress certain evidence. See Docket No. 21. The United States ("government") resists the motion. See Docket No. 24. This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and DSD L.R. Crim. 57.11.

**FACTS**

An evidentiary hearing was held on October 25, 2023. Mr. Ahrendt was there in person along with his lawyer, Lyndsay DeMatteo. The government was represented by its Assistant United States Attorney, Elizabeth Ebert. One

witness testified and two exhibits were received into evidence.  From this

testimony and these exhibits, the court makes the following findings of fact.

On December 26, 2022, at 8:56:31 p.m. (20:56:31) ███████, a citizen,

called 911 to report a male subject sitting in the passenger seat of a black Ford

F150 pickup truck smoking a joint and waving a pistol around at a gas station

at a specific address in Sioux Falls, South Dakota.  Ex. 1 at p. 2 (Command

Log).  The reporting person stated the man did not point the gun at anyone,

but did "wave it around."  Id.  He described the suspect as a white male

wearing a ball cap and stated the pickup had Colorado license plates.  Id.  The

reporting person gave his contact telephone number.  Id.

Dispatch notified, among others, Officer Austin Van Diepen and his

partner, Officer Justin Purcell, of this information.  Officers Van Diepen and

Purcell traveled in a marked patrol vehicle to the area of the gas station.  En

route, Officer Van Diepen telephoned the reporting person at 9:03:44 p.m.

(21:03:44) to gain additional information.

The reporting person told Officer Van Diepen he witnessed a male in the

passenger side of a pickup smoking a joint who had a gun.  Ex. 2 at

00:00-00:05 (dashcam and bodycam video).  The man was sitting in the

passenger side of the pickup.  Id. at 00:06-00:13.  The reporting person stated

the man did not point the gun at anyone, but he was waving the gun around.

Id. at 00:19-00:26.

The reporting person described a second person as either the man's

girlfriend or wife, and stated she had long black hair and was wearing a

stocking cap.  Id. at 00:27-00:39.  He had observed the female entering the convenience store then returning to the truck with two fountain sodas.  Id. at 00:40-00:43.  The female was the driver.  Id. at 00:43-00:45.

Officer Van Diepen asked the reporting person how they knew that the man was smoking a joint.  Id. at 00:46-00:49.  The reporting person stated, "you could smell marijuana pretty good."  Id. at 00:50-00:55.  Officer Van Diepen stated it was illegal to possess a gun while intoxicated by a substance, but asked the reporting person if he observed the man doing anything else illegal with the gun.  Id. at 00:56-1:07.  The reporting person reiterated that the man did not point the gun at anyone but stated that if the man was sitting there doing stupid stuff, smoking "dope" and waving a gun around, the reporting person worried about "what's gonna happen next."  Id. at 1:08-1:21.  He stated that is why he called police.  Id. at 1:22-1:26.

Officer Van Diepen told the reporting person that he was just arriving at the gas station and asked where the man went.  Id. at 1:26-1:31.  The reporting person stated the pickup truck left the gas station lot and turned right, which was southbound on Marion Road, while the reporting person went north.  Id. at 1:32-1:37.  Officer Van Diepen asked the reporting person how much time had elapsed since he saw the pickup leave the gas station.  Id. at 1:38-1:51.  The reporting person estimated 10 minutes had elapsed.  Id. at 1:52-1:58.  He observed the pickup leave just before the reporting person dialed 911.  Id.  The reporting person confirmed the pickup was not northbound, so it would have traveled either east, west, or south.  Id. at 1:59-2:10.

3

Officers Van Diepen and Purcell drove to the Lie'brary Bar located nearby to the gas station in Sioux Falls.[1]  They began driving through the parking lot of the bar which contained many, many vehicles.  See Ex. 2 at 2:47-3:28.  They located a black Ford F150 with Colorado license plates with two occupants:  a male in the passenger seat wearing a ball cap and a female in the driver's seat.  Id. at 3:28.  The two officers parked their patrol car near the truck with a light shining on the truck and its occupants.  They did not block the truck in with their patrol car.  The officers then initiated what Officer Van Diepen called a felony or high-risk stop.  This type of stop was dictated by the fact that there was a weapon potentially involved.

The officers exited their patrol vehicle and called to the occupants of the truck to exit the vehicle.  Ex. 2 at 3:47.  Both officers had their service weapons drawn and at a low ready position, meaning they were not pointing their weapons at the truck occupants, but had their weapons ready for immediate use should that become necessary.

After the first request, neither occupant exited the truck.  One of the officers again called, in a louder voice this time, asking the man specifically to put his hands up and step out of the truck.  Id. at 4:06.  The officer had to repeat the command a third time before the man in the passenger seat made any movement to exit the truck.  Id. at 4:14.  The officers told the occupants to

---

[1] The Lie'brary Bar is less than one block south of the gas station where the reporting person observed the man with the gun and is located on South Marion Road.

exit one at a time, passenger first, and directed the driver to keep her hands visible.  Id. at 4:21.

When the man exited the truck, one of the officers called to him to put his hands up where the police could see them.  Id. at 4:25.  The man initially put his hands up, but as he rounded the front hood of the truck, he put his hands down near his pants pockets.  Id. at 4:32.  The officer had to shout again to the man to keep his hands up.  Id.  The man stated, "it's f---g cold out here."  Id. at 4:43.  The officer promised he would explain the reason for the stop as soon as he could.  Id.  The officer asked the man to lift his shirt and turn around to expose the waistband of his pants; the man complied, doing a little dance and wagging his butt at the officers as he did so.  Id. at 4:51.  The officer then instructed the man to place his hands on the hood of his truck and to stay there.  He did comply with these instructions.  Id. at 4:59.

The officer then directed the driver to exit the vehicle.  Id. At 5:06.  A woman with long dark hair and wearing a stocking cap exited the driver's side of the vehicle.  Id. at 5:09.  The officers asked her to also lift the hem of her shirt and show her waistband while turning in a circle and the woman complied.  Id. at 5:10.  She was then directed to put her hands on the hood of the truck as well.  Id. at 5:14.

The officer told the two suspects that the officers would come to them; they were instructed not to move.  Id. at 5:27.  Both officers holstered their service weapons as they approached the pickup truck.  Hearing Transcript (HT) at p. 19.  The officer explained that they were just going to pat both suspects

down to make sure they did not have any weapons on them.  See Ex. 2 at 5:32.

Both were patted down.  The man complained that it was freezing out (he had a

short-sleeved shirt on and no coat).  Id. at 5:38.  Officer Van Diepen explained

to the man that police had gotten a call about a black F150 pickup truck with

a man sitting in it with a ball cap on, smoking a joint and waving a gun

around.  Id. at 5:52.  The man denied it was him.  Id. At 5:59.  Officer Van

Diepen asked if there were any firearms in the vehicle and the man said "no."

Id. at 6:16.  The officer asked the man if he could just look in the truck and

assure that there were not any weapons in the vehicle.  Id. at 6:21.  The man

denied permission to look inside the vehicle.  Id.

The officer asked if the two had any marijuana.  Id. At 6:27.  Both

suspects said there was no marijuana, only cigarettes.  Id. at 6:30.  The man

added that he "leaves all his marijuana at home now days."  Id. at 6:35.  The

man continued to complain about the cold.  Id. at 6:43.  Officer Van Diepen

admitted at the evidentiary hearing in this matter that he did not recall

smelling the odor of marijuana on the man when he approached him, although

he testified it was outdoors and there was some wind.  Also, although the

passenger side door of the truck was left open when the man exited the vehicle,

Officer Van Diepen stated he was never near that open door but was located on

the driver's side of the truck.

Officer Van Diepen suggested they could sit in his patrol car to keep

warm while he figured out what was going on.  Id. at 6:47-6:49.  The man

replied, "there's nothing goin' on."  Id. at 6:51.  The man stated he wanted to go

6

into the bar and asked if he was under arrest. Id. at 7:00. The officer stated that they just needed to figure out what was going on. Id.

The man asked if he could get his coat out of the truck, and the officer replied not at that time, but invited the man to sit inside the heated patrol vehicle and assured the man he was not going to be handcuffed. Id. at 7:11. Officer Van Diepen also testified that it is standard practice in an investigation for intoxication to invite the suspect to sit in the patrol car. HT at p. 44. When seated close to a suspect in a closed environment indicia of intoxication are easier to discern. Id. Officer Van Diepen stated that with marijuana, as with alcohol, individuals who are habituated to an intoxicating substance may be able to ingest a lot of that substance and be intoxicated without showing a lot of outward signs of intoxication. Id. at pp. 44-45. Both the man and the woman took seats in the back of the patrol vehicle. See Ex. 2 at 7:26. The two police officers sat in the front seats. Id. at 7:47.

Officer Van Diepen stated he needed to find out if there was a firearm on board or anything to be concerned about. He asked the man for his name (the man had earlier stated he did not have his identification card with him). Id. at 7:56. The man stated his name was Nathaniel Ahrendt. Id. at 7:58-8:01. The officer asked for his date of birth. Id. at 8:08. The man stated it was February 23, 1990. Id. at 8:11. Officer Van Diepen entered this information into a computer in the patrol car. Id. at 8:13. Officer Van Diepen testified that when he looked up the name Nathaniel Ahrendt, the computer showed a report for both Nathaniel and for Lucas Ahrendt, stating that Lucas has used the name

7

Nathaniel to give a false name to law enforcement before.  HT at p. 20.  Officer

Van Diepen then asked the man if he was giving a false name.  See HT  at 8:18.

The man denied he was doing so.  Id. at 8:20.

A screen appeared on the police computer which had a photograph of a

man's face displayed.  Id. at 8:47.  Officer Van Diepen testified that the booking

photo for Lucas Ahrendt appeared to match the man in his car.  HT at pp. 20-

21.  The officer then asked the man for his social security number.  Id. at 8:55.

The man stated he did not know it.  Id. at 8:57.  Officer Van Diepen then

stated, "you want to tell me your real name, Lucas?"  Id. at 9:03.  The man

continued to maintain his name was Nathaniel.  Id. at 9:10.  Officer Van

Diepen then stated the man looked just like Lucas.  Id. at 9:10.  The man then

stated he and Lucas were twins.  Id. at 9:16.  Officer Van Diepen stated Lucas

and Nathaniel had different birthdays.  Id. at 9:20.  The man then seemingly

admitted he was Lucas Ahrendt.  Id.

Officer Van Diepen and Officer Purcell then exited the patrol car, opened

the back seat door, and got Mr. Ahrendt out of the patrol car.  Id. at 9:39.

Mr. Ahrendt was arrested for false personation to deceive law enforcement and

he was handcuffed.  Id. at 9:56-10:10.  Mr. Ahrendt was also told there was an

outstanding arrest for his person.  Id. at 10:19.  A more thorough search of his

person was done at that time and a vape pen containing THC, the psychoactive

ingredient in marijuana, was discovered.  Id. at 10:48.

While Officers Purcell and Van Diepen were interacting with the two

subjects, other police officers arrived on the scene including Officer

Christopher Schoepf (identified as "K93" on the Command Log) at 9:14:09 p.m. (21:14:09). Ex. 1 at pp. 2, 4. Officer Schoepf saw in plain view through the open passenger-side door that there was a black pistol lying on the floor of the truck on the passenger side.[2] A photograph of the firearm was taken before the truck was searched. Ex. 2 at 14:43. Officer Van Diepen asked Mr. Ahrendt if he had a medical marijuana card; although he claimed to have a Colorado medical marijuana card, he could produce no evidence of such a card. Officer Van Diepen confirmed that South Dakota does not honor medical marijuana cards from other states and a search of the truck ensued in which the firearm was taken into evidence.

Mr. Ahrendt now moves to suppress the evidence seized from the pickup truck, from his person, and all statements he made. In support of his motion, Mr. Ahrendt argues he was subjected to de facto arrest without reasonable suspicion or probable cause from the inception of his encounter with police on the night in question. See Docket No. 21 at p. 1. He further argues that, since he was in custody, his statements to police must be suppressed because he was not given Miranda warnings. Id. He further argues that the search of the truck violated his Fourth Amendment rights because there was neither consent nor probable cause in support of the search. Id. at pp. 1-2.

---

[2] Mr. Ahrendt writes in his brief that he legally owned and registered his firearm. Docket No. 21-1 at p. 4, ¶ 19. He introduced no evidence at the hearing to support this assertion. Moreover, that is the crucial fact raised by the indictment in this case: did Mr. Ahrendt possess a firearm illegally on December 26, 2022? A grand jury has found probable cause to believe he did commit an illegality. See Docket No. 1.

The government resists Mr. Ahrendt's motion.  See Docket No. 24.  The government argues that the tip from the identified reporting person as well as the officers' corroboration of some of the tipster's information gave police reasonable suspicion to investigate Mr. Ahrendt to determine if criminal activity was afoot.  The government justifies the seizure of the marijuana vape pen as a search incident to Mr. Ahrendt's arrest after he committed the crime of false personation with intent to deceive law enforcement.  Finally, the government asserts the police had probable cause to search the truck under the automobile exception to the warrant requirement after discovering the vape pen.  The government did not address Mr. Ahrendt's Miranda argument.

## DISCUSSION

### A.    Reasonable Suspicion for the Initial Encounter/Stop

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. Fourth Amendment protections extend to persons in their automobiles. Delaware v. Prouse, 440 U.S. 648, 663 (1979) (citing Adams v. Williams, 407 U.S. 143, 146 (1972)).  "A traffic stop constitutes a 'seizure' within the meaning of the Fourth Amendment."  United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004) (citing Prouse, 440 U.S. at 653).

"A relatively brief encounter, a routine traffic stop is more analogous to a so-called 'Terry stop' . . . than to a formal arrest."  Rodriguez v. United States, 575 U.S. 348, 354 (2015) (quoting Knowles v. Iowa, 525 U.S. 113, 117 (1998))

(alteration deleted); see generally Terry v. Ohio, 392 U.S. 1 (1968).  A Terry stop must be supported by reasonable suspicion or probable cause.  Terry, 392 U.S. at 21-22, 27; United States v. Holly, 983 F.3d 361, 364 (8th Cir. 2020) ("Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred.")

An officer making a Terry stop based on reasonable suspicion, "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 27).  Officers must have "a particularized and objective basis for suspecting the particular person of criminal activity." Navarette v. California, 572 U.S. 393, 396 (2014) (citations omitted).  Reasonable suspicion in support of a Terry stop "is dependent upon both the content of information possessed by police and its degree of reliability." Id. at 397 (quoting Alabama v. White, 496 U.S. 325, 330 (1990)).

When evaluating whether the standard has been met, courts must consider the totality of the circumstances.  Id. (citation omitted).  "[T]he constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved, and the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop." United States v. Herrera-Gonzales, 474 F.3d 1105, 1109 (8th Cir. 2007) (citation omitted);  see also United States v. Andrews, 465 F.3d 346, 347 (8th Cir. 2006) (per curiam) ("[T]he fourth amendment is not violated if an objectively good

11

reason for a traffic stop exists, whatever the actual subjective motive of the officer making the stop may have been.").

A traffic stop need not be based on the police officer's personal observation—it can be based on information supplied by a third party. Navarette, 572 U.S. at 397. Even a single anonymous tip may provide the necessary reasonable suspicion if the indicia of reliability are sufficient—such as richness of detail, eyewitness observation, use of the 911 system to report the tip, and an absence of any reason to suspect the tipster had a motive to fabricate. Id. at 397-401. An anonymous tip whose details are corroborated by police may also make the tip sufficiently reliable to create reasonable suspicion. Id. at 398. Although a traffic violation can provide the basis for a Terry stop, there is no requirement that a traffic violation occur if there are other grounds providing the officer with a reasonable, articulable suspicion of criminal activity. United States v. Jacobsen, 391 F.3d 904, 906-07 (8th Cir. 2004) (quoting United States v. Mora-Higuera, 269 F.3d 905, 909 (8th Cir. 2001)).

Where a traffic stop is based on an anonymous tip, the tip must "be 'suitably corroborated' and exhibit 'sufficient indicia of reliability' " in order to rise to the level of reasonable suspicion. Parker v. Chard, 777 F.3d 977, 980 (8th Cir. 2015) (quoting Florida v. J.L., 529 U.S. 266, 270 (2000)). In Alabama v. White, police received an anonymous tip that a named person would leave an identified apartment at a specific time and transport cocaine in a brown Plymouth station wagon with a broken taillight to a named motel. 496 U.S.

12

325, 327 (1990).  Police were able to visually corroborate most aspects of the tip such as the suspect's sex, the departure time, the vehicle, and her destination.  Id. at 331-32.  The Court held the tip, along with its subsequent corroboration, gave rise to reasonable suspicion for a Terry stop.  Id. at 332.

A tip alleging a traffic violation must "contain sufficient quantity of information to support an inference that the tipster has witnessed an actual . . . violation."  United States v. Wheat, 278 F.3d 722, 732 (8th Cir. 2001).  The time interval between the police receiving the tip and locating the vehicle may also bear on the reliability of the tip.  Id. at 731.  "[T]he more extensive the description of the alleged offense, the greater the likelihood that the tip will give rise to reasonable suspicion."  Id. at 732 n.8.

In United States v. Wheat, a tipster called 911 to report a vehicle "passing on the wrong side of the road, cutting off other cars, and otherwise being driven as if by a 'complete maniac.' "  Id. at 724.  The tip contained the make and color of the vehicle, "named the first three letters of its license plate, and gave [the vehicle's] location and direction."  Id. at 732.  The court held these details were sufficient for the officers to "be certain that the vehicle stopped [was] the same as the one identified by the caller."  Id. at 731–32.  But for reasonable suspicion to exist, a tip must include more than just the location and appearance of the vehicle.  Id. at 733.  The tip must "be reliable in its assertion of illegality," not just identity.  Id.  The cornerstone of a tip's reliability is the basis of the tipster's knowledge.  Id. at 734.  Crimes committed

in the open and witnessed firsthand by the tipster are at the higher end of the reliability spectrum.  Id.

Here, crucial to analyzing the tip made by the reporting person—who gave their real name and contact telephone number to the 911 operator—is whether the conduct he reported observing was illegal.  Mr. Ahrendt argues that adults can open carry handguns in public in South Dakota and in Sioux Falls, so the waving about of a handgun was not illegal.  See Docket No. 21-1 at p. 4.  He also points out that South Dakota permits citizens to possess marijuana for medical reasons.  Id. at p. 5.  Therefore, Mr. Ahrendt suggests the tip merely relayed conduct which the tipster "personally disapprove[d] of," but which was not illegal conduct.  Docket No. 21-1 at p. 1.

The government argues to the contrary that, under South Dakota law, it is illegal to possess a firearm while intoxicated.  Therefore, the conduct observed and reported by the tipster constituted illegal conduct.  Docket No. 24 at pp. 7–8.  The government's argument is correct.

Under South Dakota law, it is a class 1 misdemeanor to have personal possession of a loaded firearm while intoxicated.  See SDCL § 22-14-7(3).  In State v. Williams, the South Dakota Supreme Court held that officers viewing a suspect remove a gun from a holster on his hip and replace it therein gave the officers reasonable suspicion to make a Terry stop of the man, given the fact the man was outside a bar at closing time and it is illegal under South Dakota law to possess a gun while intoxicated.  947 N.W.2d 612, 617-18 (S.D. 2020).  No specific facts were recited by the court in its decision that Williams was

14

intoxicated other than his proximity to a bar and the fact that the bars were then just closing.  Id. at 614-15.  Only after initiating a Terry stop and removing the man's firearm from his possession did the officers observe signs of intoxication—Williams was slow to respond to commands, had slurred speech, and glossy, watery, bloodshot eyes.  Id. at 615.  The court noted that the Fourth Amendment requires courts to determine reasonableness of a search or seizure through a balancing test and consideration of the totality of circumstances.  Id. at 616.  Here, the potential harm or risk was great as the officers had no idea what Williams' intentions were, and they acted to prevent any sort of harm from materializing.  Id. at 617.  This was true even though Williams never brandished the weapon by threatening anyone or pointing the gun at anyone.  Id.

Obviously, the Fourth Amendment analysis of the Williams court is not binding on this court.  The Fourth Amendment is a federal constitutional provision and, as such, federal law is the binding precedent.  Baker v. Carr, 369 U.S. 186, 211 (1962).  However, the Williams decision clearly establishes that personal possession of a firearm by an intoxicated person is illegal under South Dakota law and officers need not wait for harm to ensue before making contact with one suspected of violating the law.  Indeed, no harm is required to be proven for the law to be violated.

Turning now to the totality of circumstances.  Here, the court concludes that the tip the officers acted on was reliable.  It was based on the reporting person's first-hand observations.  The reporting person used the 911 system to

make the report, which makes the tipster accountable and makes it more likely

that a tipster is not going to report false information. Navarette, 572 U.S. at

400–01. The tip was given almost simultaneously with the tipster's

observations—he testified he called 911 as soon as the black F150 pickup

truck left the gas station parking lot. Only 10 minutes elapsed between the tip

being made and the officers' encounter of Mr. Ahrendt.

Many of the details of the reporting person's tip were corroborated by the

officers: the make, model, and licensing of the vehicle; the description of the

occupants of the vehicle; and the direction of travel of the vehicle. True, these

details were innocent details. Nothing about these corroborated facts showed

that a crime was afoot. However, it is not necessary for the officers to

themselves witness the suspicious behavior. Id. at 397 (stating that "[w]e have

firmly rejected the argument that reasonable cause for an investigative stop

can only be based on the officer's personal observation, rather than on

information supplied by another person.") (cleaned up) (quoting Adams v.

Williams, 407 U.S. 143, 147 (1972)). And the Court has stated that "an

informant who is proved to tell the truth about some things is more likely to tell

the truth about other things, including the claim that the object of the tip is

engaged in criminal activity." Id. at 398 (quoting White, 496 U.S. at 331).

The fact that the reporting person's tip derived from his own eyewitness

of the events bolsters the credibility of the tip. Id. at 399. The fact that the tip

was called in contemporaneously with the observed conduct makes the tip

more reliable. Id. The fact that the tipster used the 911 system and gave his

name and phone number bolsters the credibility of the tipster, as does the fact that he picked up and answered his phone when Officer Van Diepen called him back.  Id. at 400–01.

When Officer Van Diepen challenged the tipster on his identification of the odor of marijuana, the tipster told the officer that he recognized the smell of marijuana while observing Mr. Ahrendt smoke.  Officer Van Diepen testified at trial that marijuana is so pervasive in our society these days that nearly everyone can recognize the distinctive odor of marijuana.  And the tipster saw Mr. Ahrendt waving a gun around.  Again, it is not necessary for a suspect to brandish a weapon or use it to threaten anyone in order to violate SDCL § 22-14-7(3).  The mere possession of the gun while openly smoking an intoxicating substance is enough to create reasonable suspicion for police to approach a suspect and investigate further.

"Police are permitted to make investigative stops of a vehicle if they have reasonable suspicion that an individual in that vehicle recently committed a crime in a general area."  United States v. Martin, 15 F.4th 878, 881 (8th Cir. 2021) (citations omitted).  The Eighth Circuit has found reasonable suspicion to exist even when an eyewitness' description differs somewhat from the vehicle stopped "where there are few or no other potential suspects in the area who match the description."  United States v. Quinn, 812 F.3d 694, 699 (8th Cir. 2016).  Here, there were no factual errors in the reporting person's description of the man, the driver, or their vehicle.  The vehicle and occupants matching the reporting person's description were located within a very short time and a

17

very short distance from where the suspicious behavior was reported. The court concludes that the police had reasonable suspicion that an individual in the black Ford F150 pickup truck with Colorado license plates had recently committed a crime in the general area. Martin, 15 F.4th at 881.

Mr. Ahrendt argues that the tipster may have been wrong about smelling the odor of marijuana, the odor could have emanated from someone other than Mr. Ahrendt at the gas station, and that the gun could have been a toy or unloaded. But even legal conduct can give rise to reasonable suspicion for a Terry stop as the caselaw makes clear.

In Navarette, the Court rejected the defendant's argument that the erratic driving reported by the tipster could have been the result of some wholly legal conduct, such as "responding to an unruly child or other distraction." Navarette, 572 U.S. at 403. In rejecting this argument, the Court stated that "reasonable suspicion need not rule out the possibility of innocent conduct." Id. (quoting United States v. Arvizu, 534 U.S. 266, 277 (2002)).

In United States v. Perkins, there was an anonymous tip that two white males were displaying and pointing rifles in all directions in the front yard of a duplex at a specific address and that the men had arrived on scene driving a red car with a silver or white stripe. 363 F.3d 317, 319 (4th Cir. 2004). Officers drove to the location a short time after the tip and encountered a vehicle with the same description containing two men; the officers initiated a traffic stop. Id. at 320. Upon approaching the vehicle after the stop, officers viewed a "loaded, high-powered rifle lying in plain view . . . on the back seat."

18

Id.  Because the driver had a prior felony conviction, he was arrested.[3]  Id.
Perkins appealed the denial of his suppression motion to the Fourth Circuit.
Id.

The court first noted that the tip was reliable as it was based on
contemporaneous first-hand observation of the tipster and the officers
corroborated a very short time later many of the details of the tip—the
appearance and location of the vehicle as well as its occupants.  Id. at 322.

Open gun possession was a legal activity in West Virginia.  Id. at 326.
The defendant argued that his Fourth Amendment rights were violated because
the tip did not report illegal activity, only legal activity.  Id.  The court rejected
this argument.  Id. at 326-27.  The court drew a distinction between the
reasonable suspicion standard required in Terry and the probable cause
standard applicable in other contexts.  Id.  Under the probable cause standard,
the question is whether the officer had a reasonable basis for believing that a
suspect "had committed or was committing an offense."  Id. at 327 (quotation
omitted).  In other words, criminal activity must have already occurred or be
occurring.  Id.  The reasonable suspicion standard asks whether the officer
reasonably believes that "criminal activity may be afoot."  Id. (quoting Terry,

---

[3] It would be another fifteen years before the Supreme Court decided that a
prior felon, to be culpable for possession, must also know "he belonged to [a
relevant] category of persons barred from possessing a firearm."  United States
v. Jackson, 69 F.4th 495, 499 (8th Cir. 2023) (citing Rehaif v. United States,
588 U.S. ___, 139 S. Ct. 2191, 2200 (2019)).  See United States v. Langley, 62
F.3d 602, 604–08 (4th Cir. 1995) (en banc), abrogated by Rehaif, 588 U.S. ___,
139 S. Ct. 2191 (2019) (Fourth Circuit refusing to extend "a mens rea
requirement to a defendant's felony status.").

392 U.S. at 30). The difference, the court explained, was between "past or present illegalities" (probable cause) and an officer's "ability to prevent future wrongdoing" (reasonable suspicion), which is at the heart of <u>Terry</u>. <u>Id.</u>

The <u>Perkins</u> court noted that in <u>Terry</u> itself, the actions of the defendants which the officers observed were legal—they were "pacing back and forth and talking to each other outside of a store." <u>Id.</u> (citing <u>Terry</u>, 392 U.S. at 22-23). In <u>Perkins</u>, the tip from the informer was that two men were pointing rifles in various directions in the front yard of a duplex well known for drug activity in a high crime and drug trafficking area. <u>Id.</u>

It is not illegal to openly carry a firearm under West Virginia law, and sportsmen routinely display hunting and sporting rifles. <u>Id.</u> However, the context of the tip was important: there, the activity was taking place "outside of a known drug house in the middle of a residential but high-crime and drug-ridden neighborhood." <u>Id.</u> This type of activity in this setting, "would give any officer a commonsensical reason to be suspicious." <u>Id.</u> The court concluded that reasonable suspicion existed because the reported behavior, while legal, rightfully aroused the officer's suspicion warranting an investigatory stop. <u>Id.</u>

In <u>United States v. Watts</u>, a citizen called law enforcement and reported several suspicious persons loading what appeared to be long guns into a blue van. 7 F.3d 122, 123-24 (8th Cir. 1993). Police pulled Watts' blue van over, checked Watts' driver's license, and told Watts and his passenger that they had been pulled over because of a report of property being loaded into a van. <u>Id.</u> Watts and his passenger gave conflicting answers when asked if there were any

20

guns in the van.  Id. at 124.  Law enforcement then searched the van, found three guns, and wrote down the serial numbers on the guns.  Id.  The alleged owner of the guns denied knowing Watts or his passenger and Watts was then arrested for being a felon in possession of a firearm.  Id. at 124.

Watts argued that the stop of his van violated the Fourth Amendment. Id.  The Eighth Circuit noted that a Terry stop can be supported by suspicious activity that does not "conclusively prove guilt." Id. at 125 (citing United States v. Campbell, 843 F.2d 1089, 1093 (8th Cir. 1988)).  Conduct that is "consistent with both guilt and innocence" may nevertheless support a reasonable suspicion justifying a Terry stop.  Id.  The Watts court affirmed the district court's holding that the tip provided reasonable articulable suspicion for the stop of the van.  Id.

Here, at the time the tip was made, it was conceivable that Mr. Ahrendt had a South Dakota medical marijuana card or that he was not smoking marijuana at all.  It was also conceivable that he had an open carry permit for a firearm or that his firearm was a toy.  But waving a gun around at a public gas station while smoking something an observer thought was marijuana, and then driving to a crowded bar at nighttime with that same gun in one's possession is commonsensically the type of potentially dangerous conduct that police can and should investigate.  Whether it was legal conduct or illegal, it was the type of suspicious behavior police have a right to investigate to potentially prevent future harm.  Perkins, 363 F.3d at 327.

21

Mr. Ahrendt cites <u>Duffie v. City of Lincoln</u>, 834 F.3d 877 (8th Cir. 2016), in support of his assertion that the police lacked reasonable suspicion to stop him. Docket No. 21-1 at pp. 5, 8. The court finds the facts of <u>Duffie</u> to be inapposite.

In <u>Duffie</u>, clerks at a convenience store reported a patron—a young African American male with short black hair—who acted strangely but not threateningly inside the store. <u>Id.</u> at 879-80. Outside the store, the young man got into the passenger seat of a maroon van with white stripes driven by a young African American man with braids and a white tank top. <u>Id.</u> The young man in the passenger seat held up a handgun and mimed blowing smoke from the barrel but did not point the gun at anyone or otherwise act in a threatening manner. <u>Id.</u> at 879. Acting on this information, police pulled over Duffie's van over 3 1/2 hours later. <u>Id.</u> at 880. Duffie was a 58-year-old bald man who was a double amputee with a handicap tag hanging from his rearview mirror. <u>Id.</u> The Eighth Circuit held that police did not have reasonable suspicion to pull Duffie over. <u>Id.</u> at 883-84.

The court noted that the clerk's report did not describe any illegal activity as citizens were allowed to open carry firearms in Lincoln, Nebraska, and the man in the passenger seat did not brandish or threaten anyone with the gun. <u>Id.</u> Furthermore, the court noted the several-hour delay between the tip and the traffic stop and further held that the police could not reasonably believe the 58-year-old bald Duffie matched the description of either the driver or the passenger, both of whom were described as young men with hair. <u>Id.</u> at 884.

The facts in Mr. Ahrendt's case point to a different legal conclusion. Here, the persons and the vehicle stopped by Officers Purcell and Van Diepen matched the descriptions given by the reporting person. In addition, a very short period of time elapsed between the report and the traffic stop. Also, the traffic stop occurred in very close proximity to the location of the suspicious person and his vehicle as last seen by the reporting person. Finally, as already discussed at length above, the information in the tip described potentially illegal conduct: not just possession and display of a gun (as in Duffie), but possession and display of a gun coupled with open and obvious ingestion of an intoxicating substance. The Duffie decision does not change this court's conclusion that the officers had reasonable suspicion to conduct a Terry stop of Mr. Ahrendt.

**B.    Reasonable Suspicion to Detain Mr. Ahrendt to Investigate Further**

When an officer is justified in making a Terry stop, the "duration of police inquiries . . . is determined by the seizure's 'mission'—to address the . . . violation that warranted the stop and attend to related safety concerns." Rodriguez, 575 U.S. at 354 (citations omitted). Part of the "ordinary inquiries" attendant to a Terry stop include verifying the suspect's identity and checking whether there are outstanding arrest warrants for the suspect. Id. at 355.

Here, Mr. Ahrendt stated almost immediately that he had not done anything wrong, denied that he was the person described at the gas station, and denied that he had any weapons or marijuana. Mr. Ahrendt also argued that he was not exhibiting any of the classic signs of intoxication such as

stumbling, slurring his words, or vomiting.  Mr. Ahrendt argued at the evidentiary hearing that, upon his denial of any wrongdoing, police were obligated to let him go about his business, which he asked to be allowed to do. The court disagrees.

At a minimum, as <u>Rodriguez</u> informs, the officers had a right to investigate whether Mr. Ahrendt had a weapon, and the Fourth Amendment does not require police to rely upon a suspect's (in this case untruthful) assertions on that matter.  The police also had a right to verify Mr. Ahrendt's identity and find out if he had any warrants before ending the encounter.

The police went about this business when Mr. Ahrendt committed another crime—he lied about his identity and his date of birth to the officers, thereby giving them probable cause to arrest Mr. Ahrendt upon discovering his lie because it is a crime to give false identifying information to a police officer with the intent to deceive the officer.  SDCL § 22-40-1.

Only 5 minutes and 35 seconds elapsed from the time the police first encountered the pickup truck and the time they discovered Mr. Ahrendt's true identity and his lie about the same.  <u>See</u> Ex. 2 (3:28 initial encounter to 9:03 confronting Mr. Ahrendt about his true name).  Of this 5 and a half minutes, several of those minutes were utilized getting the occupants out of the truck in a manner that protected the officers' safety and ensuring the suspects did not have any weapons on their persons.  This is prompt action and does not run afoul of the Fourth Amendment's imperative to promptly investigate.

As for Mr. Ahrendt's arguments that he did not exhibit any signs of intoxication, the court rejects that characterization of the evidence. It is true that Mr. Ahrendt did not exhibit the classic signs of *alcohol* intoxication such as stumbling, slurring words, or vomiting. But the signs of marijuana intoxication can be different from the signs of alcohol intoxication. Furthermore, there were signs that Mr. Ahrendt might be intoxicated. He did not move to exit the truck until police gave the third command for him to do so. He disobeyed officers' repeated instructions to keep his hands raised. And when asked to show his waistband and turn around he danced a little jig, waggling his butt at the officers. A reasonable officer could view this series of actions by Mr. Ahrendt as signs of intoxication.

## C.    Degree of Force Used to Make the Stop

Mr. Ahrendt also takes issue with the manner of the officers' encounter— specifically, he objects to being ordered out of his vehicle at gunpoint, a circumstance he characterizes as a de facto arrest. Docket No. 21 at p. 1.

A <u>Terry</u> stop, even when supported by reasonable suspicion, may violate the Fourth Amendment if officers use unreasonable force in making the stop. <u>United States v. Navarrete-Barron</u>, 192 F.3d 786, 790 (8th Cir. 1999) (citing <u>Dunaway v. New York</u>, 442 U.S. 200, 212 (1979)). Officers are required to use "the least intrusive means of detention and investigation . . . reasonably necessary to conduct the stop, [but] they are permitted to take any measures that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." <u>Waters v. Madson</u>, 921 F.3d

725, 737 (8th Cir. 2019) (cleaned up) (quoting Navarrete-Barron, 192 F.3d at

790; United States v. Sanford, 813 F.3d 708, 713 (8th Cir. 2016) (per curiam)).

In United States v. Navarrete-Barron, the court held the officers did not

use unreasonable force in making a stop of a truck with their service weapons

drawn.  192 F.3d at 791.  The officers had reasonable suspicion to believe the

occupants of the truck were involved in drug trafficking and, the court

reasoned, drug trafficking "very often is accompanied by dangerous weapons."

Id.

In United States v. Johnson, the court stated that "it is well established

that officers may reasonably draw weapons during a Terry stop when the

defendant is suspected of carrying a weapon—even if the defendant is

otherwise cooperative."  31 F.4th 618, 623 (8th Cir. 2022).  In Johnson, the

court found officers were justified in drawing their firearms, ordering Johnson

to put his hands up, and drop his backpack because the officers reasonably

believed Johnson might be armed.  Id. at 621, 623.

In Mr. Ahrendt's case, officers had information that Mr. Ahrendt had

possessed a pistol a very short time prior to the Terry stop.  They were justified

in believing a weapon was likely present in the truck at the scene which was a

very crowded bar parking lot.  Under the holding in Navarrete-Barron and

Johnson then, the officers were justified in drawing their weapons when

26

making the traffic stop.  Doing so did not turn the encounter into an arrest.

Johnson, 31 F.4th at 623.[4]

### D.    Legality of the Search Incident to Arrest of Mr. Ahrendt's Person

"Generally, to search a private place, person, or effect, law enforcement

must obtain a warrant supported by probable cause from a judicial officer."

United States v. Sanders, 341 F.3d 809, 818 (8th Cir. 2003) (citing Katz v.

United States, 389 U.S. 347, 357 (1967)).  The same proposition holds true for

the seizure of property.  "Generally, police officers must have a warrant before

they can seize a person's property."  United States v. $7,850.00 in U.S.

Currency, 7 F.3d 1355, 1358 (8th Cir. 1993) (citing United States v. Place, 462

U.S. 696, 701 (1983)).  A search or seizure conducted by the government

without a warrant is presumptively unreasonable.  United States v. Kimhong

Thi Le, 474 F.3d 511, 514 (8th Cir. 2007); United States v. Cedano-Medina,

366 F.3d 682, 684 (8th Cir. 2004).  "The touchstone of the Fourth

Amendment's promise is 'reasonableness,' which generally--though not always-

translates into a warrant requirement."  United States v. Hatten, 68 F.3d 257,

260 (8th Cir. 1995) (citing Veronia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653

(1995)).

Because the "overriding principle of the Fourth Amendment is one of

reasonableness," the courts have created "logical and flexible" exceptions to the

---

[4] The government also cites the community caretaker doctrine as grounds for
the officers' making contact with Mr. Ahrendt and detaining him.  Docket No.
24 at pp. 10–13.  Because the court has found the encounter was justified
under Terry and its progeny, the court expresses no opinion about the
applicability of the community caretaker doctrine.

warrant requirement.  <u>United States v. Martin</u>, 806 F.2d 204, 206 (8th Cir. 1986).  "A warrantless search of a private place can survive constitutional inhibition only upon a showing that the surrounding facts brought it within one of the exceptions to the rule that a search must rest upon a search warrant."  <u>United States v. Heisman</u>, 503 F.2d 1284, 1287 (8th Cir. 1974) (citing <u>Jones v. United States</u>, 357 U.S. 493, 499 (1958)).  "When the government seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception."  <u>United States v. Reidesel</u>, 987 F.2d 1383, 1388 (8th Cir. 1993).

One exception to the warrant requirement is the search incident to arrest.  "[A] lawful custodial arrest establishes authority to conduct a full search of the arrestee's person, and . . . such search is 'not only an exception to the warrant requirement of the Fourth Amendment, but is also a reasonable search under that Amendment' " <u>United States v. Ball</u>, 499 F.3d 890, 896 (8th Cir. 2007) (quoting <u>United States v. Hrasky</u>, 453 F.3d 1099, 1101 (8th Cir. 2006) (quoting <u>United States v. Robinson</u>, 414 U.S. 218, 235 (1973)).  The exception for searches incident to arrests is founded on the policy of ensuring officer safety and evidence preservation.  <u>Arizona v. Gant</u>, 556 U.S. 332, 338 (2009).  Thus, a search incident to an arrest can include only "the arrestee's person and the area 'within his immediate control.' " <u>Id.</u> at 339 (quoting <u>Chimel v. California</u>, 395 U.S. 752, 763 (1969)).  This means the area that the arrestee can reach in order to gain possession of destructible evidence or a

weapon.  Id.  This area-of-reach restriction ensures that the exception for searches incident to arrest is commensurate with the purposes of the exception.  Id.  If the search extends into areas that the arrestee cannot reach, the exception for warrantless searches incident to arrest does not apply.  Id.

In Arizona v. Gant, the Court clarified that the search of the interior of a vehicle incident to an arrest of a recent occupant of that vehicle is allowed only when the arrestee is unsecured and within reaching distance of the passenger compartment of the vehicle at the time of the search.  Id. at 343.  This overruled a line of lower court cases that had misinterpreted the Court's decision in New York v. Belton, 453 U.S. 454, 460 (1981), as authorizing a warrantless search of the interior of a vehicle any time a recent occupant of the vehicle was arrested.  Id.

The Gant Court added that a search of the vehicle incident to an arrest would also be authorized when it is "reasonable to believe that evidence relevant to the crime of arrest might be found in the vehicle."  Id. (quoting Thornton v. United States, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in judgment)).  Where the arrest is made for a traffic violation, it will be rare for a reasonable belief to exist that evidence of the crime of arrest will be found in the vehicle.  Id.  However, where one is arrested for a drug offense, there will often be a reasonable belief that evidence of the crime of arrest will be found in the vehicle.  Id. at 344.

Here, once officers determined that Mr. Ahrendt had given a false name and date of birth in order to deceive the officers about his true identity, the

officers had probable cause to arrest Mr. Ahrendt.  See SDCL § 22-40-1 (making it a crime to give police a false name in order to deceive); Virginia v. Moore, 553 U.S. 164, 171 (2008) (an officer may make a warrantless arrest if a suspect commits even a minor crime in his presence).  Because the officers had grounds for a lawful arrest, they also had grounds to search Mr. Ahrendt's person incident to that arrest.  Robinson, 414 U.S. at 235; Ball, 499 F.3d at 896; Hrasky, 453 F.3d at 1101.

The search of Mr. Ahrendt's person uncovered his possession of an illegal vape pen containing THC.  That search and the discovery of the vape pen were within the bounds of the Fourth Amendment under the search incident to arrest exception and should not be suppressed.  However, under Gant, the search of the vehicle was not justified simply because the officers had grounds to arrest Mr. Ahrendt for false personation.  Gant, 556 U.S. at 339, 343.  The contents of the vehicle were not at the time of the arrest within reach of Mr. Ahrendt and the government makes no assertion that evidence of the crime Mr. Ahrendt was arrested for—false personation—was likely to be found in the truck.  The search of the pickup truck, then, must be independently justified.

## E.    Legality of the Search of the Pickup Truck

Another exception to the warrant requirement is the automobile exception.  Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam); United States v. Caves, 890 F.2d 87, 89 (8th Cir. 1989).  The Supreme Court has held that the "ready mobility" of automobiles creates an exigency that allows a warrantless search of an automobile where probable cause exists to

believe that the vehicle contains contraband or evidence of criminal activity.
Labron, 518 U.S. at 940; Caves, 890 F.2d at 89.  Aside from the mobility of
cars, the automobile exception to the warrant requirement is also supported by
the fact that citizens have a reduced expectation of privacy in an automobile
because automobiles are subject to pervasive regulation.  Labron, 518 U.S. at
940 (citing California v. Carney, 471 U.S. 386, 391-92 (1985)); Caves, 890 F.2d
at 89.

 If probable cause exists in support of the automobile exception, the
search may encompass the entire passenger compartment of the automobile,
its trunk, and "all containers, packages, and compartments located in the
vehicle" so long as "there is probable cause to believe that the object of the
search may be found there."  Caves, 890 F.2d at 90.  Probable cause requires
"only a probability or substantial chance of criminal activity, not an actual
showing of such activity."  United States v. Neumann, 183 F.3d 753, 756 (8th
Cir. 1999) (citing United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997)
(quoting Illinois v. Gates, 462 U.S. 213, 243-244 n.13 (1983))).

 The Eighth Circuit "ha[s] repeatedly held that the odor of marijuana
provides probable cause for a warrantless search."  United States v. Milk, 66
F.4th 1121, 1131 (8th Cir. 2023)  (quoting United States v. Williams, 955 F.3d
734, 737 (8th Cir. 2020); see also United States v. Smith, 789 F.3d 923, 928
(8th Cir. 2015); United States v. Barry, 394 F.3d 1070, 1078 (8th Cir. 2005);
United States v. Peltier, 217 F.3d 608, 610 (8th Cir. 2000); United States v.
McCoy, 200 F.3d 582, 584 (8th Cir. 2000); Neumann, 183 F.3d at 756.

Although the legality of marijuana varies among the 50 states under state law, as of the writing of this opinion, marijuana is illegal under federal law (Controlled Substances Act, 21 U.S.C. § 801 *et seq.*) and illegal in South Dakota without a medical marijuana card. See 21 U.S.C. § 812, Schedule I (c)(10); SDCL §§ 22-42-6, 22-42-24; cf. SDCL § 34-20G-2. And even where a person holds a medical marijuana card, "[s]moking or vaping cannabis . . . [i]n any public place" is always prohibited. SDCL § 34-20G-18(3)(b).

Here, once Officer Van Diepen found the marijuana vape pen on Mr. Ahrendt's person, that discovery—coupled with the reporting person's tip that Mr. Ahrendt was smoking marijuana in the pickup truck at the gas station—gave rise to probable cause to search the truck. Mr. Ahrendt was then known to be in possession of marijuana, and it was probable that further evidence of that crime might be in the vehicle. The search of the truck was justified under the automobile exception. As such, it did not violate the Fourth Amendment and the fruits of the search need not be suppressed.[5]

## F.    Whether Miranda Warnings Were Required Pre-Arrest

The holding of Miranda v. Arizona "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990)

---

[5] The government also argues the firearm was seen by Officer Schoepf in plain view through the open passenger side door of the truck and that this plain view sighting justified the search of the truck also. The court need not address additional grounds justifying the search having found one exception to the warrant requirement applicable.

(citing 384 U.S. 436, 444 (1966)).  A <u>Miranda</u> warning is required prior to

questioning whenever two conditions are present:  (1) the suspect is being

interrogated and (2) the suspect is in custody.  <u>Unites States v. Flores-</u>

<u>Sandoval</u>, 474 F.3d 1142, 1146 (8th Cir. 2007); <u>Griffin</u>, 922 F.2d at 1347;

<u>United States v. Carter</u>, 884 F.2d 368, 370 (8th Cir. 1989).

 Here, neither Mr. Ahrendt nor the government address whether

Mr. Ahrendt made any post-arrest statements and, if so, whether <u>Miranda</u>

warnings were given post-arrest.  It is undisputed that, prior to being arrested

for false personation, no <u>Miranda</u> warnings were given to Mr. Ahrendt.  <u>See</u> Ex.

2.  Furthermore, it is clear he was being interrogated.  <u>Id.</u>  So, the question of

whether <u>Miranda</u> warnings were required hinges on whether Mr. Ahrendt was

in custody from the time of the initiation of the traffic stop until his arrest at

9:07 on Ex. 2.

 The government concedes that Mr. Ahrendt was seized within the

meaning of the Fourth Amendment during this timeframe (<u>see</u> Docket No. 24 at

p. 10), but the government does not address whether seizure under the *Fourth*

Amendment is the equivalent of being "in custody" for purposes of the *Fifth*

Amendment.  In fact, the government does not address Mr. Ahrendt's <u>Miranda</u>

argument at all.  <u>See</u> Docket No. 24.

 Some courts have placed the burden of proving that the defendant was

not in custody at the time of the interrogation on the government.  <u>See</u> <u>United</u>

<u>States v. Charbonneau</u>, 979 F. Supp. 1177, 1181 (S.D. Ohio 1997).  Other

courts have placed the initial burden on the defendant to prove that he was "in

custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden. See United States v. Davis, 792 F.2d 1299, 1309 (5th Cir. 1986); United States v. Moore, 104 F.3d 377, 391 (D.C. Cir. 1997) (Silberman, J. concurring). The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have. See, e.g., United States v. Morriss, No. 06-6010-01-CR-SJ-SOW, 2006 WL 3519344, at *12 (W.D. Mo. Dec. 6, 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority). For purposes of this report and recommendation, the court has placed the burden of proving that Mr. Ahrendt's statements were *not* the subject of custodial interrogation on the government.

A suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in any significant way." Griffin, 922 F.2d at 1347 (citing Miranda, 384 U.S. at 444; Berkemer v. McCarty, 468 U.S. 420, 429 (1984)). Absent formal arrest, a suspect is deemed is be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest." Berkemer, 468 U.S. at 440 (quotation omitted); United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005) (citation omitted); Griffin, 922 F.2d at 1347 (citations omitted); Carter, 884 F.2d at 370 (citations omitted). The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator. Berkemer, 468 U.S. at 442;

34

Black Bear, 422 F.3d at 661 (citations omitted); Griffin, 922 F.2d at 1347

(citations omitted); Carter, 884 F.2d at 370 (citing Berkemer, 468 U.S. at 442).

In determining whether a suspect reasonably believed himself or herself to be

in custody, the court examines the totality of the circumstances.  Carter, 884

F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988)

(per curiam)).

Under the totality of the circumstances test, six nonexclusive factors

have emerged with some frequency:

> (1) whether the suspect was informed that he was free to leave and
> that answering the interrogator's questions was voluntary; (2)
> whether the suspect possessed freedom of movement during the
> interrogation; (3) whether the suspect initiated contact with the
> interrogator or voluntarily acquiesced in the interrogation; (4)
> whether the interrogator employed strong-arm tactics or strategies;
> (5) whether the atmosphere of the interrogation was dominated by
> the police; and (6) whether the suspect was arrested at the close of
> the interrogation.

Flores-Sandoval, 474 F.3d at 1146-47 (8th Cir. 2007) (citing Griffin, 922 F.2d

at 1349).

Reference to these factors is helpful, but these factors are not exclusive

and custody "cannot be resolved merely by counting up the number of factors

on each side of the balance and rendering a decision accordingly."  Id. at 1147

(quotation omitted).

Under the totality of the facts in this case, the court concludes a

reasonable person in Mr. Ahrendt's circumstances would have believed he was

not free to leave at any time during the encounter.  For the first minutes of the

encounter, every action of Mr. Ahrendt was controlled by police:  he was told in

great detail how to exit the truck, what to do with his hands, how to show his waistband, and to place his hands on the hood of the truck. After this initial phase, when the indicia of police control loosened somewhat, Mr. Ahrendt in fact asked to be released and was told he could not go. He asked to access the cab of the pickup truck and was told he could not.

Officer Van Diepen told Mr. Ahrendt he would not be placed in handcuffs if he sat in the officer's patrol car, but that is not the same as telling a suspect they are not under arrest or won't be placed under arrest. Ultimately multiple police officers and multiple patrol vehicles were present at the scene. See Ex. 1 & 2. The questioning took place in part while officers had their firearms drawn and pointed down toward the ground. Part of the questioning took place in the back of a marked police patrol vehicle. Both were police-dominated environments. Finally, Mr. Ahrendt was in fact arrested at the conclusion of the encounter. For these reasons, the court finds Mr. Ahrendt was "in custody" and recommends suppressing Mr. Ahrendt's pre-arrest statements.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends granting in part and denying in part defendant Lucas Ahrendt's motion to suppress (Docket No. 21). Specifically, the court recommends denying Mr. Ahrendt's motion to suppress the physical evidence seized pursuant to the search of his person and of the pickup truck. The court recommends granting his request to suppress his pre-arrest statements.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 1st day of November, 2023.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge