UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  vs.<br><br>LUCAS EWALD AHRENDT,<br><br>        Defendant. | 4:23-CR-40092-KES<br><br>ORDER ADOPTING IN PART, MODIFYING IN PART, AND REJECTING IN PART THE REPORT AND RECOMMENDATION, AND GRANTING IN PART AND DENYING IN PART AHRENDT'S MOTION TO SUPPRESS |

The Government filed an indictment against defendant, Lucas Ahrendt, which charges Ahrendt with two counts of illegal possession of a firearm. *See* Docket 1. Ahrendt moves to suppress all evidence that law enforcement found on his person and in his vehicle on the night of his arrest, December 26, 2022. *See* Docket 21. Ahrendt also moves to suppress the statements he made to officers prior to being advised of his *Miranda* rights. *Id.*

The court referred Ahrendt's motion to Magistrate Judge Veronica L. Duffy under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, Magistrate Judge Duffy recommended Ahrendt's motion to suppress be denied in part and granted in part. Docket 30. Specifically, the Report and Recommendation recommends that Ahrendt's motion to suppress physical evidence found on Ahrendt's person and in his vehicle be denied. *See id.* at 36. The Report and Recommendation recommends granting Ahrendt's motion to suppress the statements Ahrendt made to officers prior to his arrest. *Id.* Both Ahrendt and the Government timely filed objections to the Report and

Recommendation. Dockets 34, 37. After a de novo review of the Report and Recommendation and the record, the court issues the following order.

## LEGAL STANDARD

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 59 of the Federal Rules of Criminal Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## FACTS

After reviewing the suppression hearing's transcript and the exhibits received into evidence, the court makes the following factual findings necessary to resolve Ahrendt's motion:

On December 26, 2022, at approximately 8:56 p.m., an individual who identified himself as Kelly Rear called 911 dispatch, and reported that he had seen a male smoking a joint and waving "some sort of pistol" around. *See* Docket 27 at 1-2; Docket 28 at 7. According to Rear, the male did not point the

2

gun at anyone. Docket 27 at 2. Rear told 911 dispatch that the male was sitting in the passenger seat of a black Ford F-150 with Colorado license plates. *Id.* Rear also told 911 dispatch that he saw a female with black hair sitting in the driver's seat of the pickup truck. *See id.* at 2. Rear reported this information from a Get-n-Go on the corner of 57th and Marion. *See id.* at 1. Additionally, Rear left a call-back number. *See id.* at 2.

That night, Officer Austin VanDiepen and Officer Justin Purcell were on patrol duty riding together in the same vehicle. *See* Docket 28 at 6-7; Docket 27 at 2 (showing Officer Purcell's first name). Officer Purcell had access to the information Rear gave to 911 dispatch in real-time. *See* Docket 28 at 7-10. At roughly 9:00 p.m., Officer VanDiepen and Officer Purcell were dispatched and headed towards the Get-n-Go. *See* Docket 27 at 3; Docket 28 at 10. On the way, Officer VanDiepen called Rear's call-back number to find out as much information as possible. *See* Docket 28 at 11-12. Rear answered. *See* Docket 28 at 11; *see also* Exhibit 2 at 0:00-2:17.[1]

During this follow-up conversation, Rear told Officer VanDiepen that he saw a man sitting in the passenger side of a pickup, smoking a joint, and waving a gun around. *See* Exhibit 2 at 0:00-0:35. Rear also reported that a woman with long black hair had purchased some fountain drinks and returned to the truck's driver's seat. *See id.* at 0:35-0:47. Officer VanDiepen asked Rear how Rear knew that the man was smoking marijuana, and Rear responded

---

[1] Exhibit 2 is Officer VanDiepen's body camera footage, which was admitted into evidence at the suppression hearing. *See* Docket 28 at 24.

that "you could smell marijuana pretty good." *See id.* at 0:47-0:57. Rear confirmed that the man was not threatening anybody with the gun. *See id.* at 0:57-1:15. Additionally, Officer VanDiepen asked about the location of the pickup truck, and Rear told him that the pickup truck came out of the Get-n-Go parking lot and headed south. *See id.* at 1:20-1:40. Rear reported that he did not know where the truck went afterwards. *Id.* at 1:40-1:52. According to Rear, this phone conversation took place roughly ten minutes after Rear initially observed the man in the truck. *See id.* at 1:52-2:00.

After speaking with Rear on the phone, Officer Purcell and Officer VanDiepen drove for approximately a minute and pulled into the Lie'brary Bar parking lot. *See id.* at 2:30-2:50; Docket 28 at 26. This lot is south of the Get-n-Go parking lot. *See* Docket 28 at 15. Less than a minute after pulling into the lot, the officers found a black, Ford F-150 pickup truck with Colorado plates backed into a parking space. *See* Exhibit 2 at 3:35. Officer VanDiepen turned on the front lights of the patrol vehicle and spotted a passenger that appeared to match Rear's description of the individual Rear saw waving a gun in the air while smoking a joint. *See* Docket 28 at 26-27.

Moments later, Officer Purcell and Officer VanDiepen left the patrol vehicle, approached the pickup truck, and ordered both the male passenger (eventually identified as Ahrendt) and the female driver out of the truck. *See* Exhibit 2 at 3:40-5:30. Both officers initially approached the truck with their guns drawn and pointed downward (not at the individuals in the vehicle). *See* Docket 28 at 17. The officers ordered both individuals to display their

4

waistlines so that officers could see whether they were armed. *See* Exhibit 2 at 4:45-5:15; *see also* Docket 28 at 18-19. After seeing that neither had a firearm in their waistlines, the officers then ordered Ahrendt and the female driver to put their hands on the hood of the truck. *Id.* Ahrendt and the female driver generally complied with the officers' commands. *See* Exhibit 2 at 4:45-5:15; Docket 28 at 18.

Immediately after, the officers approached the individuals. *See* Exhibit 2 at 5:15-5:40. While approaching, Officer VanDiepen put his gun away, and during the suppression hearing, assumed that Officer Purcell did as well. *See* Docket 28 at 19. Officer VanDiepen then performed a pat-down of Ahrendt, and Officer Purcell performed a pat-down of the female driver. *See* Exhibit 2 at 5:40-5:47. Neither Ahrendt nor the female driver had a weapon on their person. *See id.* Officer VanDiepen briefly explained why he and Officer Purcell ordered Ahrendt and the female driver out of the truck. *See id.* at 5:47-5:58. Ahrendt denied waving a firearm in the truck while smoking a joint. *Id.* at 5:57-6:35. Officer VanDiepen then asked Ahrendt whether there were any firearms or marijuana in the truck. *See id.*  In response, Ahrendt denied that there were firearms or marijuana in the vehicle. *See id.* at 5:57-6:35. Ahrendt also explained that he leaves all of his marijuana at home. *See id.* at 6:30. The female driver explained that they had cigarettes in the car. *Id.* at 6:27. Neither Ahrendt nor the female driver consented to officers searching the truck. *See id.* at 6:03-6:35.

Within a minute and a half from conducting the pat-down of Ahrendt,

Officer VanDiepen asked Ahrendt for his I.D. *See id.* at 5:30-6:45. Ahrendt responded that he did not have is I.D. on him and that it was "too F****** cold." *See id.* At that point, Officer VanDiepen told[2] Ahrendt that they would continue the conversation in the back of the patrol car where there was heat. *See id.* After Officer VanDiepen requested that Ahrendt get inside the back of the patrol car, Ahrendt said he would "rather not" because "there's nothing going on." *See id.* at 6:45-6:55. Ahrendt said that he had done nothing illegal and asked if he was under arrest, to which Officer Purcell responded that Ahrendt was being detained. *See id.* at 6:55-7:05. Ahrendt then asked if he could get his coat from the car, and Officer VanDiepen said no. *See id.* at 7:00-7:09.

During this roughly minute and a half long conversation outside, Officer VanDiepen admitted that he did not observe any signs of Ahrendt being intoxicated. *See* Docket 28 at 34-40. Similarly, Officer VanDiepen admitted that he did not personally see Ahrendt waving a firearm or smoking marijuana. *See id.* at 39-40. Officer VanDiepen further admitted that he did not smell any marijuana when interacting with Ahrendt. *See id.* at 39.

The weather outside that night was very cold, as Ahrendt and both officers repeatedly referenced how cold it was outside. *See, e.g.*, Exhibit 2 at 6:20 ("It's f****** freezing, man."); 6:43 ("It's too F****** cold out here"); 10:52 (saying how "damn cold" it was); 11:10 (noting it is "so f****** cold"); 19:25

---

[2] For reasons explained below, the court concludes that even though Officer VanDiepen testified that he gave Ahrendt an option to stay outside, the circumstances of the weather made this "option" an unreasonable one and thus finds that Officer VanDiepen functionally ordered Ahrendt into the patrol vehicle.

("We're all cold out here"). The wind was blowing, snow covered the ground, and people's breaths visibly filled the air when speaking. *See generally id.*

Roughly thirty seconds after Ahrendt asked whether he was being arrested and after Officer VanDiepen refused to allow Ahrendt to grab a coat, Ahrendt entered the back of the patrol car. *See id.* at 7:07-7:35. At this point, the officers did not handcuff Ahrendt. *See* Docket 28 at 42. Once inside, Officer VanDiepen turned the heat on immediately and then asked Ahrendt for his name, making the total amount of time between Ahrendt asking if he was being arrested and Officer VanDiepen asking for Ahrendt's name to be roughly a minute. *See id.* at 7:07-8:00. Ahrendt answered, "Nathaniel." *See id.* at 7:55-8:00. Officer VanDiepen asked for his last name, to which Ahrendt responded with "Ahrendt." *See id.* at 8:00-8:10. Officer VanDiepen then asked Ahrendt if he was using a false name, and Ahrendt said, "No sir." *See id.* at 8:15. Officer VanDiepen asked Ahrendt to spell Nathaniel and asked Ahrendt for his social security number. *See id.* at 8:15-9:00. Ahrendt spelled "Nathaniel" but stated he did not know his social security number. *See id.* Realizing Ahrendt provided a false name, Officer VanDiepen asked, "Do you want to tell me your real name, Lucas?" *Id.* at 9:00-9:05. Initially, Ahrendt denied that he provided a false name and stated that he was twins with Lucas, but admitted soon after that he was in fact Lucas after Officer VanDiepen pointed out that Lucas and Nathaniel had different birthdates. *See id.* at 9:05-9:25.

Once Ahrendt admitted to providing a false name, (and after Officer VanDiepen discovered Ahrendt had an outstanding warrant for his arrest)

7

Officer VanDiepen formally arrested Ahrendt, placed him in handcuffs, and searched his person. *See id.* at 9:30-11:24. Officer VanDiepen found a THC vape pen in Ahrendt's pant pocket. *See* Docket 28 at 21-22. During this interaction, Officer VanDiepen did not advise Ahrendt of his *Miranda* rights. *See* Exhibit 2 at 10:00-11:35. After discovering the THC vape pen, Officer VanDiepen searched the pickup truck. *See* Docket 28 at 21-22. In the truck, Officer VanDiepen found a nine-millimeter handgun, methamphetamine, raw marijuana, and some pills he believed to be fentanyl. *See id.* at 22. Officers found the gun on the passenger floorboard. *Id.*

After finding these items, Officer VanDiepen returned to Ahrendt, and still did not advise Ahrendt of his *Miranda* rights. *See* Exhibit 2 at 18:30-18:55. Officer VanDiepen asked Ahrendt if he (Ahrendt) had his medical marijuana card on him. *See* Exhibit 2 at 18:55. Ahrendt responded no, and that the card is a Colorado medical card. *Id.* at 19:00. Officer VanDiepen followed up and asked, "It's a Colorado medical card?" *Id.* at 19:06-19:10. Seconds later, Officer VanDiepen again asked, "Do you have any proof of that card on you, Lucas?" *Id.* at 19:56. Ahrendt asked, "What?" and Officer VanDiepen repeated the question. *Id.* at 19:57. Although the body camera footage does not clearly capture Ahrendt's response, the court infers that Ahrendt responded no, because Officer VanDiepen immediately followed-up in saying, "Kay. Nothing in the truck either?" *Id.* at 20:05. Ahrendt's response is again difficult to hear, but based on context, the court finds that Ahrendt said no. *See id.* at 20:05-20:30.

**DISCUSSION**

Ahrent makes three primary objections to the Report and Recommendation. First, Ahrendt objects to the Report and Recommendation's conclusion that officers had reasonable suspicion for the initial encounter and pat-down of Ahrendt. *See* Docket 34 at 1-3. Second, Ahrendt argues that even if officers initially had reasonable suspicion, such reasonable suspicion dissipated by the time Ahrendt gave Officer VanDiepen a false name. *See id.* at 3-4. And third, Ahrendt argues that the officers did not simply perform a *Terry* stop, but instead engaged in a *de facto* arrest of Ahrendt, for which the officers needed probable cause rather than just reasonable suspicion. *See id.* at 4-5. The court addresses Ahrendt's objections in turn. The Government also objects to the Report and Recommendation's recommendation that Ahrendt's pre-arrest statements be suppressed. Docket 37.

I. **Ahrendt's First Objection: Reasonable Suspicion for Initial Encounter and Pat-down**

"[O]fficers may conduct brief investigatory stops of individuals if they have a reasonable articulable suspicion of criminal activity." *United States v. Griffith*, 533 F.3d 979, 983-84 (8th Cir. 2008). "An officer's suspicion is reasonable if he 'knows particularized, objective facts that lead to a rational inference that a crime is being or has been committed.' " *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008) (quoting *United States v. Hernandez-Hernandez*, 327 F.3d 703, 706 (8th Cir. 2003)). "Reasonable suspicion must be supported by more than a 'mere hunch,' but 'the likelihood

of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard.' " *United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002))). Indeed, reasonable suspicion requires only "some minimal level of objective justification[,]" *INS v. Delgado*, 466 U.S. 210, 217 (1984), and must be evaluated looking to the totality of the circumstances, *see United States v. Sanchez*, 955 F.3d 669, 675 (8th Cir. 2020). "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277.

Reasonable suspicion may be based, in part, on a tip. *See United States v. Mosely*, 878 F.3d 246, 252-53 (8th Cir. 2017). The key inquiry is the content of the tip and the degree of the tip's reliability. *Alabama v. White*, 496 U.S. 325, 330 (1990). The Supreme Court in *Navarette v. California*, 572 U.S. 393, 397-401 (2014) discussed that an eye-witness who makes an anonymous, contemporaneous report and who is subject to being held accountable for making a false report may be sufficient to provide reasonable suspicion.

Starting with whether the content of the tip was sufficient for officers to reasonably suspect Ahrendt had committed a crime, Rear reported seeing a man wave a firearm while smoking a joint. Docket 27 at 1. Contrary to Ahrendt's argument that Rear's observations were "legal in and of themselves," the content of Rear's tip gave offices reasonable suspicion that the individual was violating SDCL § 22-14-7, which makes it illegal to "hav[e] in personal

possession a loaded firearm while intoxicated[.]"[3] SDCL § 22-14-7; *see also*

*State v. Williams*, 947 N.W.2d 612, 617 n.3 (noting that SDCL § 22-14-7 is a

class 1 misdemeanor). It is reasonable to suspect that an individual smoking a

joint is intoxicated, and it is axiomatic that an individual waving a gun around

is in possession of the gun. Although Rear reported that he did not see the

male pointing a gun at anyone or threatening anyone, SDCL § 22-14-7 does not

require such action and instead criminalizes merely possessing a firearm while

intoxicated. Thus, the contents of the tip were sufficient to provide reasonable

suspicion that Ahrendt committed a crime.

Turning to the reliability of Rear's tip, the court finds that Rear's tip was

sufficiently reliable for multiple reasons. First, Rear initially made the 911 call

and reported the incident from his direct observations in real time. *See* Docket

27 at 1-2. Second, Rear identified himself and left his call back number.

Indeed, Rear answered Officer VanDiepen's follow-up call, and provided

substantially the same information that he had already provided to 911

dispatch. *See* Exhibit 2 at 0:00-2:00. Third, the officers corroborated much of

the information Rear provided. Rear reported that he had seen a male sitting in

the passenger seat of a black Ford F-150 with Colorado license plates, that

there was a female sitting in the driver's seat of the pickup truck, and that he

made these observations from a Get-n-Go on the corner of 57th and Marion.

---

[3] SDCL § 22-1-2 defines "intoxication," in relevant part, as "a disturbance of
mental or physical capacities resulting from the introduction of substances into
the body."

*See id;* Docket 27 at 1-2. Minutes later, officers found a black, Ford F-150 pickup truck with Colorado plates, with a passenger and driver that matched Rear's description, in the parking lot of Lie'brary Bar (which is to the south of Get-n-Go, the direction Rear reported that the truck drove from the gas station). Exhibit 2 at 3:35; Docket 28 at 15, 26-27.

Ahrendt acknowledges that many of the details Rear provided were accurate, but nevertheless argues that Rear's tip was not reliable specifically with regards to reporting reliable *illegal* behavior. *See* Docket 34 at 1-2. In support, Ahrendt argues that the tipster could have been wrong about the smell of marijuana, the source of the smell, and whether Ahrendt possessed a real or fake gun. *See id.* Specifically, Ahrendt pointed out during the suppression hearing that Officer VanDiepen did not ask Rear how far away Rear was from Ahrendt when Rear allegedly smelled marijuana and whether Rear had any special training on detecting marijuana. *See* Docket 28 at 30-31. Furthermore, Officer VanDiepen admitted that Rear indicated he was at a public gas station where the wind was blowing. *See id.* at 37.

It is true that Ahrendt could have been engaged in completely innocent conduct, such as smoking a cigarette while waving a fake gun. But "[a] determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. Here, based on the reliability of Rear's tip, on the other corroborating information (the make, model, and color of the car, the physical descriptions of the passenger and driver, and the location of the truck), as well as the fact that Rear's tip was

12

based on personal observations, not anonymous, and subject to accountability, officers were entitled to reasonably suspect that the individual Rear spotted possessed a gun while intoxicated. Rear specifically told Officer VanDiepen that he could smell the marijuana. *See* Exhibit 2 at 0:47-0:57. While these facts may very well be insufficient to establish probable cause, reasonable suspicion is a lower standard. *See Roberts*, 787 F.3d at 1209. The court finds that based on the totality of circumstances—namely Rear's tip and the officers' corroboration of much of the information provided by Rear—officers had a sufficient "minimal level of objective justification" to approach Ahrendt. *See INS v. Delgado*, 466 U.S. at 217; *Sanchez*, 955 F.3d at 674.

For virtually the same reasons, the court finds the officers had reasonable suspicion to suspect that Ahrendt was armed and dangerous, because it is reasonable that an intoxicated person with a firearm is dangerous. *See United States v. Trogdon*, 789 F.3d 907, 910 (8th Cir. 2015); *Cf. United States v. Robinson*, 670 F.3d 874, 877 (8th Cir. 2012) (approving of officers handcuffing suspect during investigatory stop when suspect potentially possessed a firearm while intoxicated or hostile because such handcuffing was reasonably necessary to secure officer security). Thus, the court finds that officers permissibly engaged in a *Terry* pat-down of Ahrendt.[4] The court overrules Ahrendt's first objection.

---

[4] The court notes that officers engaged in a *Terry* pat-down of the female driver. It is a much closer call regarding the permissibility of her pat-down, but the court need not decide this issue because the female driver is not the one before the court and Ahrendt has no standing to challenge her search.

## II.    Ahrendt's Second Objection: After Pat-Down and Before Formal Arrest

Ahrendt next objects to the Report and Recommendation's conclusion that officers were justified in continuing to detain Ahrendt after conducting an initial pat-down and not seeing any noticeable signs of intoxication. *See* Docket 34 at 3-4.

To determine whether officers justifiably prolonged an encounter, the court must determine whether officers seized an individual "beyond the time reasonably required to complete the mission" of the original justification of the encounter. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (cleaned up and quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Specifically, if the encounter " 'exceeds the time needed to handle the matter for which the [encounter] was made,' the duration of the [encounter] violates the Fourth Amendment." *United States v. Merrett*, 8 F.4th 743, 751 (8th Cir. 2021) (quoting *Mosley*, 878 F.3d at 253).

In *Rodriguez*, the Supreme Court decided whether officers unreasonably prolonged an ordinary traffic stop by waiting for a drug-sniffing dog to arrive on scene after officers were done with the initial traffic stop. *See Rodriguez*, 575 U.S. at 350. There, the officers permissibly stopped the vehicle because the suspect drove on the shoulder of a state highway for one or two seconds, in violation of state law. *See id.* at 351. After identifying the driver and passenger, issuing a traffic citation, explaining the citation, and handing back all of the identifying documents to the driver, the officer instructed the driver to stay in

14

order to allow time for dogs to circle the car. *See id.* at 352. After deploying the dogs, officers eventually found a significant amount of methamphetamine. *Id.*

The Supreme Court held that the officer violated the defendant's Fourth Amendment rights because the officers prolonged the traffic stop beyond the stop's mission. *See id.* at 355-56. Specifically, the court held that the officer completed his mission of effectuating the traffic stop, and that deploying the dogs to sniff the car was unrelated to such mission. *Id.* Because an officer may not conduct unrelated inquiries beyond the original scope of the mission "in a way that prolongs the [seizure], absent the reasonable suspicion ordinarily demanded to justifying detaining an individual[,]" the officer's deployment of the dogs violated the Fourth Amendment. *See id.* at 355.

The Government argued that so long as officers remained diligent in pursuing the original mission of the stop, and so long as the duration of the prolonged stop remained reasonable in relation to the duration of other stops involving similar circumstances, such prolongment was not unreasonable. *See id.* at 357. The Court rejected this argument, reasoning that it, "in effect," gave officers the ability to "earn bonus time to pursue an unrelated criminal investigation" so long as they complete the mission expeditiously. *Id.* Rather, the Court framed the "critical question" to be whether conducting an activity beyond the original mission " 'prolongs'—*i.e.*, adds time to—'the [mission[.]' " *Id.*

Under *Rodriguez*, the relatively short amount of time between Officer VanDiepen's initial pat-down of Ahrendt and Ahrendt eventually giving a false name to police, does not alone avoid a Fourth Amendment violation. *See id.* at

15

357. Instead, the issue here is the proper characterization of Officer VanDiepen's "mission," and whether the officers were still engaged in the permissible mission when officers continued to talk with Ahrendt after conducting an initial pat-down. *See id.* at 354; *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) ("The scope of the detention must be carefully tailored to its underlying justification.").

Here, the officers' mission was to investigate whether Ahrendt was currently possessing a firearm while intoxicated (or whether Ahrendt possessed a firearm while intoxicated in the recent past). As part of that mission, officers may have a general conversation with Ahrendt to assess whether he was in fact intoxicated. *See United States v. Hurtt*, 31 F.4th 152, 161 (10th Cir. 2022) (holding an officer may have a general conversation with a suspected intoxicated driver "to determine whether the driver was confused, disoriented, or otherwise cognitively impaired"). Furthermore, an officer's reasonable suspicion that an individual committed a crime independently allows an officer to attempt to identify the suspect. *See Pace v. City of Des Moines*, 201 F.3d 1050, 1054 (8th Cir. 2000) ("We recognize that an officer who has a reasonable suspicion that crime is afoot, but not probable cause to arrest a person, may conduct an investigative stop, and that this may include questioning and other efforts to identify the person in question."). Officer VanDiepen's interactions with Ahrendt after (and while) performing a pat-down were related in scope to his mission because Officer VanDiepen only asked Ahrendt whether Ahrendt had a firearm, whether Ahrendt was smoking marijuana, and questions related

16

to ascertaining Ahrendt's identity. *See* Exhibit 2 at 5:22-9:30. Thus, the stop was not prolonged under *Rodriguez*.

Ahrendt argues that even if officers initially had reasonable suspicion to approach him and to conduct a pat-down, officers impermissibly prolonged the encounter because they no longer possessed reasonable suspicion that Ahrendt was intoxicated. *See* Docket 34 at 3-4. In support, Ahrendt (correctly) notes that Officer VanDiepen admitted that during this pat-down, Officer VanDiepen observed no obvious signs of Ahrendt being intoxicated. *See id.* at 3. For example, Officer VanDiepen admitted that Ahrendt did not stumble or fall when exiting the truck, walked normally, complied with Officer VanDiepen's commands, did not slur his speech, and did not show any other signs of intoxication. *See* Docket 28 at 34-36, 38-40. Similarly, Officer VanDiepen admitted that he did not smell any marijuana from either Ahrendt or the vehicle. *Id.* at 37. The female driver and Ahrendt both denied having marijuana, and the female driver instead explained that they had cigarettes in the car. *See* Exhibit 2 at 6:27. Because "an investigative stop must cease once reasonable suspicion . . . dissipates[,]" *United States v. Mosley*, 878 F.3d 246, 253 (8th Cir. 2017) (quoting *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993)), Ahrendt argues that the Fourth Amendment required officers to cease talking to Ahrendt after finding no corroborating evidence that Ahrendt was intoxicated. Docket 34 at 3-4.

But even though officers did not observe any corroborating evidence of Ahrendt's intoxication (and indeed even some evidence suggesting the

17

opposite),[5] the officers' brief interaction with Ahrendt during the pat-down and prior to Ahrendt lying about his name was insufficient to dissipate the officers' reasonable suspicion that he was intoxicated. The Supreme Court's decision in *Navarette* illustrates why that is so. In *Navarette*, officers received a tip from a driver who reported that a truck (which officers later discovered was driven by the defendant) had run the driver off the road. *See* 572 U.S. at 395. After hearing this report, an officer spotted the defendant's truck driving on the highway, followed it for five minutes, and pulled the defendant over. *Id.* While following the defendant, the officer observed no evidence that the defendant was intoxicated. *Id.* at 403. Nevertheless, the Court explained that the officer had reasonable suspicion to believe the defendant was driving while intoxicated. *See id.* at 403-04.

Crucially, the defendant argued that although the officer may have had reasonable suspicion to pull over the defendant immediately, such reasonable suspicion dissipated after the officer followed the defendant without seeing any additional signs of intoxication. *See id.* at 403. The Court explicitly rejected this argument, reasoning that "[i]t is hardly surprising that the appearance of a

---

[5] The Report and Recommendation opines that Ahrendt showed potential signs of intoxication during this encounter. *See* Docket 30 at 25. According to the Report and Recommendation, Ahrendt failed to exit the truck until officers gave him a third command to do so, disobeyed officers' repeated instructions to keep his hands raised, and "danced a little jig, waggling his butt at the officers" when asked to show his waistband. *See id.* Thus, the Report and Recommendation reasoned that "[a] reasonable officer could view this series of actions by Mr. Ahrendt as signs of intoxication." *Id.* The court need not discuss this contention's merits because it is unnecessary to resolve Ahrendt's motion or his objections. Thus, the court does not adopt this specific discussion.

marked police car would inspire more careful driving for a time." *Id.* Although the Court recognized that "[e]xtended observation of an allegedly drunk driver might eventually dispel a reasonable suspicion of intoxication," the five-minute period in that case "hardly sufficed." *Id.* at 403-04.

*Navarette's* teachings control this case. The court acknowledges that Ahrendt did not show any obvious signs of intoxication when officers approached him, had a brief conversation with him, and patted him down. But the absence of additional evidence of Ahrendt's intoxication—in this brief, less than two-minute interaction—did not dissipate the officer's reasonable suspicion that Ahrendt had possessed a gun while intoxicated. *See id.*; *Amundsen v. Jones*, 533 F.3d 1192, 1200 (10th Cir. 2008) (holding that officers with initial reasonable suspicion of DUI could perform entire standard roadside sobriety tests to confirm or dispel reasonable suspicion of intoxication even though driver showed no additional signs of intoxication once officers began interacting with driver). Just like the defendant in *Navarette*, Ahrendt knew that officers were observing him and this knowledge could "inspire" more careful movements to avoid detection. *See Navarette*, 572 U.S. at 403.

Importantly, this case does not involve an officer's extended observations of Ahrendt, such as one where the officer had an up-close, intelligent conversation lasting ten minutes, in which Ahrendt showed no signs of intoxication. *See Navarette*, 572 U.S. at 403. Nor does it involve a situation in which Ahrendt passed a standardized field sobriety test or took a breathalyzer test indicating that Ahrendt had no marijuana (or other intoxicant) in his

system. *See Kansas v. Glover*, 140 S.Ct.1183, 1191 (2020) ("[T]he presence of additional facts might dispel reasonable suspicion."); *Haynes v. Minnehan*, 14 F.4th 830, 836 (8th Cir. 2021) ("But as new information flows in, a reasonable belief can dissolve into an unreasonable one."). The court further stresses that an officer's reasonable suspicion of a suspect's initial intoxication does not license an officer to speak with such suspect for an endless amount of time. But here, because Officer Vandiepen's interactions with Ahrendt were very limited (only two minutes at most), such interaction would not dissipate an officer's original reasonable suspicion that Ahrendt possessed a gun while intoxicated. The court concludes it was reasonable for Officer VanDiepen to continue the conversation. Thus, the court overrules Ahrendt's second objection that the officers unnecessarily prolonged the detention.

## III.   Ahrendt's Third Objection: De Facto Arrest

Ahrendt next argues that the officers did not simply engage in a *Terry* stop, but rather engaged in a *de facto* arrest, such that officers needed probable cause (and not merely reasonable suspicion) to investigate him. *See* Docket 34 at 3-5. Ahrendt specifically argues that the manner in which the officers initially approached him (by walking towards the truck with their guns out), their tone, and the fact that there were two of them all indicate the officers subjected Ahrendt to an arrest rather than an investigatory *Terry* stop. *See id.*

Distinguishing between whether an officer has detained an individual versus arrested an individual matters, because "[a]n arrest is valid only if there is a probable cause to believe that a suspect has committed or is about to

commit a crime, whereas a brief, investigatory detention can be based on only a reasonable suspicion that criminal activity is afoot." *Chestnut v. Wallace*, 947 F.3d 1085, 1088 (8th Cir. 2020). "A *Terry* stop may become an arrest . . . if the stop lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011) (quoting *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010)) (cleaned up). "As part of a lawful *Terry* stop, officers may take any measures that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.* (quoting *Newell*, 596 F.3d at 879) (cleaned up).

To determine whether an investigatory arrest has turned into an arrest, the court looks to five principle factors:

> (1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*United States v. Childers*, 73 F.4th 960, 963 (8th Cir. 2023) (quoting *United States v. Johnson*, 31 F.4th 618, 623 (8th Cir. 2022)).

In *Childers*, the Eighth Circuit applied this test and found the officers only detained the suspect, rather than arrested him. *See id.* at 963-65. There, police received a 911 call that reported three individuals shooting guns into a river. *See id.* at 962. Roughly seven officers were dispatched to investigate a potential violation of state law (reckless discharge of a firearm within a municipality) and noticed three individuals matching the description given in

21

the 911 call. *See id.* at 962, 964. The three individuals eventually entered a car, and the officers approached the car with their guns drawn and ordered the individuals out one by one. *See id.* at 962. Officers handcuffed all three individuals and placed them in the back of separate patrol cars. *See id.* at 963.

Applying the first and second factors, *Childers* found that they weighed in favor of the Government. *Id.* at 964. First, the number of officers (seven) was not excessive given there were three suspects. *Id.* Second, "the nature of the suspected crime elevated police concerns for the safety of the public and themselves" because officers reasonably believed the suspects were armed and had recently fired a firearm. *Id.*

The third factor also favored the Government, because the officers had responded to a 911 call from an identified witness who described the individuals "with a reasonable degree of particularity." *Id.* Specifically, the witness described the suspects' races, one of the suspect's clothing, and one of the suspect's age. *See id.* Additionally, the caller correctly identified that the individuals were in a public park. *See id.*

Regarding the fourth factor, the court found that it did not meaningfully alter the calculus because the defendant complied with the officers commands, even after initially talking back to the officers. *See id.* The court further reasoned that because the officers could not observe the vehicle's occupants, it was reasonable to direct them outside of the vehicle and separate them. *See id.*

The fifth factor favored the Government, because the officers observed the three individuals enter a vehicle, and thus officers had to stop it to prevent

22

them from leaving the parking lot. *See id.* The "obvious exigencies" of the situation justified the individuals' detention in the back of the patrol cars "until the situation stabilized and [the officers] could determine if full custodial arrest and detention were warranted." *See id.* (quoting *United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006)).

Although *Childers* differs in some ways from the instant case, they have some similarities. Like in *Childers*, the first and second factors here weigh in favor of the Government. There were only two officers on scene approaching two potential suspects, thus the ratio between the number of officers and suspects is less than the ratio in *Childers*. *See* Docket 28 at 6, 11, 15-16; *Childers*, 73 F.4th at 964 (7 officers to 3 suspects). Furthermore, officers in both situations approached suspects that officers reasonably believed were armed because officers in both cases received reliable tips about seeing a firearm. *See* Docket 28 at 11; *Childers*, 73 F.4th at 964.

Although it is true that the officers in *Childers* knew more concerning information about the suspects (that they had shot the guns into a river) compared to what the officers here knew about Ahrendt (that he simply waved a gun in the air while smoking a joint), the fact that officers reasonably believed Ahrendt had a firearm while possibly intoxicated is sufficient for both Officer VanDiepen and Officer Purcell to approach Ahrendt with their weapons drawn. *See Johnson*, 31 F.4th at 623 (concluding officers justifiably drew weapons based on their knowledge of defendant's previous history of violent felony convictions and knowledge that defendant had a firearm on his person); *United*

*States v. Fisher*, 364 F.3d 970, 973-74 (8th Cir. 2004) (holding officers permissibly drew weapons on compliant defendant because officers reasonably believed suspect was armed and dangerous); *United States v. Ramires*, 307 F.3d 713, 716 (8th Cir. 2002) (finding officers permissibly drew guns on individuals suspected of drug trafficking while such individuals left a crawl space).

Ahrendt distinguishes this case from *Johnson*. Docket 34 at 4-5. In *Johnson*, the arresting officers knew that the defendant had previous violent felony convictions, that the defendant was a person of interest in a homicide investigation, and that the defendant had just tried to flee in a car moments earlier. *See Johnson*, 31 F.4th at 621. Thus, even though *Johnson* declared that "[i]t is well established that officers may reasonably draw weapons during a *Terry* stop when the defendant is suspected of carrying a weapon[,]" *id.* at 623, Ahrendt argues this case does not match the facts in *Johnson* because Officer VanDiepen and Officer Purcell "had no knowledge of Mr. Ahrendt at all, nor had Mr. Ahrendt given police cause to believe he would not cooperate with regular force." *See* Docket 34 at 4-5.

Ahrendt further bolsters his argument by arguing that *Johnson's* rule relies on *Fisher*, which is distinguishable from the facts of this case. *See id.* at 5. Specifically, Ahrendt argues that unlike in *Fisher*, where the officer had specific information that an individual matching the defendant's description had used a gun in connection with an assault only minutes earlier and was in a high crime neighborhood, Officer VanDiepen did not have any information of

24

Ahrendt using a gun and Ahrendt was not parked in a high crime area. *See id.*
(citing *Fisher*, 364 F.3d at 973-74).

Although the court agrees that both *Johnson* and *Fisher* have
distinguishing features, the analysis does not draw a bright-line rule requiring
officers to know that a suspect had used a gun, had a violent criminal past,
"had been" or "was" suspected of homicide, had fled, or was in a high crime
area, in order to justify approaching such suspect with weapons drawn. *Cf.*
*United States v. Gastelum*, 11 F.4th 898, 905 (8th Cir. 2021) (noting the
Supreme Court "has cautioned against creating *per se* rules in the Fourth
Amendment context when the proper inquiry is consideration of the totality of
the circumstances"). Indeed, the Eighth Circuit's decision in *United States v.*
*Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) rejects this suggestion.
There, the court found that officers reasonably drew their weapons when
approaching the defendant's truck because the officers reasonably believed the
occupants of a truck were engaged in drug trafficking and the officers had
previously found ammunition linked with the truck. *See id.*

The officers in *Navarrete-Barron* arguably had less justification to
approach the defendant with a drawn firearm than here, because there, the
officers did not have any information that the suspects actually had a gun,
much less that the suspect was potentially intoxicated while possessing a gun.
*See id.* Instead, the Eighth Circuit in *Navarrete-Barron* held it was reasonable
for officers to believe the suspect had a gun solely because the officers saw
ammunition connected to the truck and because the officers believed the truck

was linked with drug trafficking, which "very often is accompanied by dangerous weapons." *Id.* At the very least, the facts in the instant case presented officers with just as much reason to be nervous, if not more, than the situation in *Navarrete-Barron*: the officers in this case had a credible tip that Ahrendt had been waving a gun while smoking a joint. It is reasonable for officers to be worried about an accidental (or even intentional) discharge. The court finds Officer Purcell and Officer VanDiepen reasonably drew their guns when approaching the pickup truck. And notably, the officers did not point their guns at Ahrendt or the passenger, but rather pointed the guns to the ground, meaning that the potential for unintentional harm was reduced. *See* Docket 28 at 17. The second factor favors the Government.

The third factor also favors the Government. As discussed above, the reporting party's tip was reliable in numerous ways: the reporting party was not anonymous (and indeed, answered a follow-up call from Officer VanDiepen), and he reported the tip in real time. *See supra,* at 11-13. Additionally, the reporting party accurately described the truck's color, make, and model, he accurately stated the truck had a Colorado license plate, he accurately described that the defendant was sitting in the passenger side of the truck, and he accurately described that the driver was a female with long hair. *See supra,* at 11-13. Although there is no evidence in the record that either Officer VanDiepen or Officer Purcell saw Ahrendt or the female driver holding a weapon when they approached the pickup truck, the officers reasonably believed that the reporting party's account that the male passenger did in fact

26

have a firearm was accurate given the accuracy of his other statements.

Similar to *Childers*, the fourth factor does not really impact the analysis. Here, the officers drew their guns before they saw whether Ahrendt or the female driver made any sudden movements, and thus neither Ahrendt's nor the driver's actions provided any additional reason for the officers to draw their weapons. This fact tilts in favor of Ahrendt. At the same time, once Ahrendt and the passenger proved that they were not armed by lifting their shirt to show their waistband, and once their hands were clearly visible and empty, Officer VanDiepen put his gun away (and believed Officer Purcell did the same). *See* Docket 28 at 18-19. Thus, the officers' initial display of weapons was reasonably tailored and did not exceed the permissible scope once officers realized that there was no immediate threat of Ahrendt or the driver using a firearm. *See United States v. Sanford*, 813 F.3d 708, 714 (8th Cir. 2016) (noting the Fourth Amendment's requirement that officers use the least intrusive means of detention and investigation that are reasonably necessary to achieve the purpose of the *Terry* stop).

Turning to the fifth factor, the court finds that it weighs slightly in favor of the Government. On one hand, the court acknowledges that the immediacy of the situation in this case is less than that in *Childers* because the officers in *Childers* had information that the suspects had actually fired the gun. *See Childers*, 73 F.4th at 964. But like in *Childers*, the officers had information that the suspects were armed, and both suspects were in vehicles, meaning that the suspects could easily escape. *See id.* (noting that the vehicle was "about to

27

leave the parking lot"). Relatedly, the pickup truck was parked with its frontside facing forward (towards the direction the vehicle would have to go in order to leave), meaning the truck was readily positioned to leave in an instant. *See* Exhibit 2 at 3:41. Furthermore, unlike in *Childers* where the interaction occurred in an isolated park with no one around, the interaction here took place in a parking lot of an open restaurant at roughly 9:07 p.m. *See Childers*, 73 F.4th at 964; Docket 28 at 15; Exhibit 2 at 6:05-12. The increased number of people around the area—including members of the public—heightens the immediacy and need to deal with the potential threat of an intoxicated individual waving a gun around. Thus, it was reasonable for officers to proceed with caution by drawing their guns while approaching the truck.

To be sure, it is theoretically possible that the officers could have approached the truck in a less threatening way, such as approaching with a taser or approaching with their hands on their gun (but without their guns drawn). But "[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *United States v. Sharpe*, 470 U.S. 675, 687 (1985). The court finds the officers were not unreasonable in not identifying a less restrictive approach. Simply put, the Fourth Amendment does not require officers to bring a knife (either literally or metaphorically) to a potential gun fight.

The court also notes that Ahrendt argues that the officers "bark[ed] orders" towards Ahrendt and the driver, and that this "barking" weighs in favor

28

of finding the officers made a *de facto* arrest. *See* Docket 34 at 4. The court need not decide whether an officers' aggressive tone of voice is relevant towards this inquiry, because here, the court finds the tone of voice was justified for two reasons. First, it was justified for Officer VanDiepen to make his commands with assertiveness given that he reasonably believed Ahrendt or the driver was armed. And second, based on the court's review of Officer VanDiepen's body camera footage, the wind and nearby road made the surrounding area loud, and thus it would be difficult for the occupants of the truck to hear him, especially because the truck's windows were rolled up. *See generally* Exhibit 2 at 3:30-4:50. Thus, Officer VanDiepen reasonably spoke loudly in order to be heard.

Finally, the court also addresses the fact that the officers took Ahrendt and the driver into the back of the police car. In *Childers*, the Eighth Circuit observed that "placing suspects in squad cars does not transform a stop into an arrest where the situation warrants the action." *Childers*, 73 F.4th at 964. Contrary to Officer VanDiepen's testimony during the suppression hearing, Ahrendt had no reasonable choice other than to go in the back of the patrol car. *See* Docket 28 at 41-42. Although Officer VanDiepen testified that Ahrendt was "free to stand outside with [an] officer in the cold if he so chose[,]" the court finds this suggestion to be uncredible and unrealistic. *See id.* During Officer VanDiepen's interaction with Ahrendt, Officer VanDiepen specifically rejected Ahrendt's request to grab a coat. *See* Exhibit 2 at 7:00-7:09. And Ahrendt asked to grab his coat for a reason: after reviewing Officer VanDiepen's

body camera footage, the court can clearly see that the weather was extremely cold, with the wind blowing. As the individuals are speaking, their breath can be seen in the air. *See, e.g.*, *id.* at 5:40. Throughout this limited interaction, Ahrendt, Officer VanDiepen, and Officer Purcell repeatedly referenced just how cold it was that night. *See, e.g.*, *id.* at 6:20; ("It's f****** freezing, man."); *id.* at 6:43 ("It's too F****** cold out here"); *id.* at 10:52 (saying how "damn cold" it was); 11:10 (noting it is "so f****** cold"); 19:25 ("We're all cold out here"). And, as Ahrendt's request suggests, Ahrendt was not wearing a coat, and instead was only wearing a short-sleeved sweater. *See generally* Exhibit 2. Thus, by denying Ahrendt's request to grab a coat while simultaneously insisting that Ahrendt continue to speak with officers, Officer VanDiepen functionally required Ahrendt to get into the back of the patrol car because standing in the cold for even a few more minutes could have resulted in serious health complications for Ahrendt.

But Officer VanDiepen's decision to move the conversation in the patrol car (with the heat turned up) was reasonable given this extreme weather. In fact, had Officer VanDiepen insisted in continuing the conversation outside, such insistence may very well have been *unreasonable*. The extreme weather in this case warranted Ahrendt's placement in the back of the patrol car, and under *Childers*, such placement does not transform the detention into an arrest. *See Childers*, 73 F.4th at 964.

In short, the officers' actions were justified and limited in scope to protect themselves, Ahrendt and the driver, and the public at large. The court

overrules Ahrendt's third objection that the officers engaged in a *de facto* arrest requiring probable cause and finds that the encounter remained a detention.

## IV.    Arrest and Subsequent Discoveries

Ahrendt does not object to the Report and Recommendation's conclusion that once Ahrendt gave a false name to Officer VanDiepen, officers had probable cause to arrest Ahrendt, search his person, and then eventually search his truck. *See generally* Docket 34; Docket 30 at 27-32. The court agrees with the Report and Recommendation on this discussion and adopts it in full.[6]

## V.    *Miranda*

Ahrendt argued in his motion, but not his memorandum in support of his motion, that his statements to the officers should be suppressed because the officers failed to advise him of his *Miranda* rights. *See* Docket 21; *see generally* Docket 21-1. The Government, in turn, did not address the *Miranda* issue in its response to Magistrate Judge Duffy. *See generally* Docket 24. For its part, the Report and Recommendation acknowledges the Government's failure to address the issue and suppressed Ahrendt's pre-arrest statements. *See* Docket 30 at 33-36. The Report and Recommendation did not address Ahrendt's statements in response to police questioning after arrest. *See id.* The Government filed objections to the Report and Recommendation that Ahrendt's

---

[6] Like the Report and Recommendation, the court need not decide the Government's alternative argument regarding the permissibility of searching the pickup truck under the community care taking doctrine. *See* Docket 24 at 6; Docket 30 at 27 n.4. Similarly, the court need not determine whether the plain view doctrine applies. *See* Docket 30 at 32 n.5.

pre-arrest statements are suppressed, and Ahrendt does not object to the Report and Recommendation's failure to address post-arrest statements. *See* Docket 37; *see generally* Docket 34.

The court first must determine the standard of review to use when reviewing the Report and Recommendation. Both parties dropped the ball when litigating the *Miranda* issue. Ahrendt specifically raised an argument regarding an alleged *Miranda* violation in his motion to suppress, stating:

> Defendant asserts that . . . the interrogation that occurred while the defendant [w]as in custody without *Miranda* advisement . . . [was] conducted . . . in violation of his rights under the . . . Fifth[], and Fourteenth Amendments to the United States Constitution. Therefore, subsequent statements made by Defendant . . . must be suppressed.

Docket 21. Although not a model of completeness, the court finds this argument, at the very least, should have prompted the Government to address the issue, even if just to say that Ahrendt failed to adequately brief it. But the Government did not. *See* Docket 24. After the Report and Recommendation addressed Ahrendt's pre-arrest, but not post-arrest statements, Ahrendt could have (and should have) objected if he wanted to exclude pre-*Miranda* and post-arrest statements made in response to the officers' interrogation. Ahrendt did not. *See* Docket 34.

Because both parties failed to timely raise arguments in different stages of litigating this issue, the court exercises its discretion to review *de novo* the *Miranda* issue. *See Thomas v. Arn*, 474 U.S. 140, 154 (1985) (stating that a district court may consider *sua sponte* review of an issue in a Report and Recommendation *de novo*); *Kliment v. Astrue*, 710 F.Supp.2d 831, 844 (N.D.

32

Iowa 2010) ("[A] district court *may* review *de novo* any issue in a magistrate judge's report and recommendation at any time."). First, the court discusses the relevant applicable legal standards under *Miranda*. Second, the court addresses Ahrendt's pre-arrest statements made to officers. And third, the court turns to Ahrendt's post-arrest statements.

### A. *Miranda* Principles

An officer must advise individuals of their *Miranda* rights when such individuals are subject to custodial interrogation. *See United States v. Rooney*, 63 F.4th 1160, 1167 (8th Cir. 2023). "A custodial interrogation is defined as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way.' " *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146 (8th Cir. 2007) (quoting *Maine v. Thibodeau*, 475 U.S. 1144, 1146 (1986)). To determine whether an individual is in custody, courts look to "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Treanton*, 57 F.4th 638, 641 (8th Cir. 2023) (quoting *United States v. Simpson*, 44 F.4th 1093, 1096 (8th Cir. 2022)). An individual is subject to interrogation when there is express police questioning, that is "reasonably likely to elicit" incriminating information, *see United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016), or "its functional equivalent, which includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the

suspect,' " *United States v. Hernandez-Mendoza*, 600 F.3d 971, 976-77 (8th Cir. 2010) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). "Interrogation does not include 'requests for routine information necessary for basic identification purposes.' " *United States v. Cowan*, 674 F.3d 947, 958 (8th Cir. 2012) (quoting *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996)). Similarly, "a suspect's answers to questions from a police officer are admissible in the absence of a *Miranda* warning so long as the questions asked of the suspect are 'reasonably prompted by a concern for the public safety.' " *United States v. Brooks*, 982 F.3d 1177, 1180 (8th Cir. 2020) (quoting *United States v. Williams*, 181 F.3d 945, 953 (8th Cir. 1999)).

### B. Pre-Arrest Statements

The court turns to Ahrendt's statements made before Officer VanDiepen arrested him, which includes Ahrendt's statements to the officers while Officer VanDiepen and Officer Purcell questioned Ahrendt outside and in the back of the patrol car prior to Officer VanDiepen formally arresting Ahrendt. The record conclusively shows that Officers never advised Ahrendt of the *Miranda* warnings, and thus the issue here is whether such failure makes his statements inadmissible. *See generally* Exhibit 2. Here, even if Ahrendt was in custody when talking to officers outside and in the back of the patrol car prior to arrest, the court finds that none of Ahrendt's statements are suppressible under *Miranda* because they fall under the public safety exception, identification exception, or they were not the subject of interrogation. For the public safety exception, Officer VanDiepen asked Ahrendt whether there were

any firearms or marijuana in the vehicle. *See* Exhibit 2 at 6:10-35. These questions were reasonably prompted by concern for public safety because it is reasonable for an officer to be concerned about whether Ahrendt had access to an intoxicating substance and a firearm. Thus, Ahrendt's response of "no" to the question of whether there were firearms in the truck and "no" to whether there was marijuana in the truck (but Ahrendt's admission that he leaves his marijuana at home) is not suppressed. *See Brooks*, 982 F.3d at 1180. With respect to the identification exception, all of the questions Officer VanDiepen asked Ahrendt while Ahrendt was in the back of the patrol car, prior to Ahrendt's arrest, related to identifying Ahrendt. *See* Exhibit 2 at 7:45-10:15. Thus, Ahrendt's responses to these questions are not suppressible. *See Cowan*, 674 F.3d at 958.

Finally, while standing outside, Ahrendt stated that "there was nothing going on," and that he hadn't done anything illegal, but Ahrendt did not make this statement in response to any question asked by an officer. *See* Exhibit 2 at 6:45-7:05. Rather, Ahrendt made this statement after Officer VanDiepen told Ahrendt, "I gotta figure out what's going on here." *See id.* This statement is not functionally equivalent to interrogation because an officer would not reasonably expect such a statement to elicit incriminating information. *See Hernandez-Mendoza*, 600 F.3d at 976-77. Thus, the court does not suppress this statement. In short, the court rejects the Report and Recommendation's finding that Ahrendt's pre-arrest statements should be suppressed. The court sustains the Government's objection as it relates to the pre-arrest statements

and finds they are admissible.

### C. Post-Arrest Statements

Ahrendt's post-arrest statements, however, are different. After arresting Ahrendt, investigating the pickup truck, and returning to Ahrendt roughly ten minutes later, Officer VanDiepen asked Ahrendt several questions about whether Ahrendt had a medical marijuana card on him and whether Ahrendt had any proof of such card either on his person or in the truck. *See* Exhibit 2 at 18:55-20:30. Ahrendt responded "no" each time. *See id.*

Ahrendt was clearly in custody at this point because he was under arrest. *See Treanton*, 57 F.4th at 641. And Ahrendt was subject to interrogation because these questions were "reasonably likely to elicit" incriminating information, because they were targeted at whether Ahrendt was legally allowed to have medical marijuana. *See Bailey*, 831 F.3d at 1038. The public safety exception does not apply here because once Ahrendt is arrested, handcuffed, and placed in the back of the vehicle, Ahrent no longer had access to a potential firearm or marijuana, and thus an officer's questioning about Ahrendt's marijuana was no longer reasonably prompted out of a concern for public safety. Thus, the court finds Ahrendt's admission to not having evidence of his medical marijuana card on his person or in the truck to be inadmissible under *Miranda*.[7]

---

[7] The court notes that when Officer VanDiepen arrested Ahrendt and searched his person, Officer VanDiepen asked Ahrendt whether Ahrendt had anything in his pockets that would poke Officer VanDiepen. *See* Exhibit 2 at 10:00-11:35. This question does not constitute interrogation for *Miranda* purposes because it is routine and reasonably aimed at officer safety rather than incriminating

**CONCLUSION**

The court overrules Ahrendt's objections and sustains the Government's objection. In doing so, the court adopts in part, modifies in part, and rejects in part Magistrate Judge Duffy's recommendation, and ultimately grants in part and denies in part Ahrendt's motion to suppress. Specifically, the court grants Ahrendt's motion to suppress his post-arrest statements regarding whether he had evidence of a medical marijuana card on his person or in the truck. The court denies Ahrendt's motion to suppress the evidence found on his person and in the truck, and his pre-arrest statements to officers. Thus, it is

ORDERED that the Report and Recommendation (Docket 29) is adopted in part, modified in part, and rejected in part. Ahrendt's to suppress (Docket 21) is granted in part and denied in part.

Dated January 11, 2024.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

---

statements, and thus the court declines to suppress Ahrendt's response. *See Hernadez-Mendoza*, 600 F.3d at 976-77.